844 A.2d 429

**STATE of Maryland**

v.

**Bruno SMULLEN.**

**No. 40, Sept. Term, 2003.**

Court of Appeals of Maryland.

March 12, 2004.

Diane E. Keller, Assistant Attorney General (Joseph Curran, Jr., Attorney General of Maryland, of Baltimore), on brief, for petitioner/cross-respondent.

Margaret L. Lanier, Assistant Public Defender (Stephen E. Harris, Public Defender, of Baltimore), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

WILNER, Judge.

On Saturday morning, May 6, 2000, Bruno Smullen, wearing latex gloves in order to maintain a sure grip, snuck up behind his adoptive father, Warren, as Warren sat on the living room couch reading a newspaper and drinking his morning coffee, and killed him by stabbing and cutting him repeatedly with a butcher knife. The autopsy revealed six stab wounds and sixteen cut wounds inflicted on Warren's head and chest. At least three of the stab wounds would have been independently fatal. Bruno then went after his adoptive sister, Portia, and

his nieces, Erica and Ashley, who also resided in the home, and stabbed or cut them as well. Fortunately, they survived the attacks.

After a jury trial in the Circuit Court for Wicomico County, Bruno was convicted of premeditated first degree murder of Warren, attempted first degree murder of Erica and Ashley, first degree assault of Portia, and various lesser included offenses. He was sentenced to life imprisonment for the murder of Warren and was given consecutive and concurrent sentences for the attempted murders of Erica and Ashley and the assault against Portia. The other convictions were merged for sentencing purposes.

In defense of the attack on his father, Bruno claimed, at various times, both perfect and imperfect self defense. That defense was based entirely on his supposedly being afflicted with battered child syndrome, leading him subjectively to believe that he was in imminent danger of death at his father's hands. Statements he had given to the police regarding alleged abuse by Warren were admitted as part of generally inculpatory confessions, but, concluding that Bruno had not established a sufficient basis for even imperfect self-defense, the court disallowed hearsay evidence of statements he and Warren had made in that regard to other persons as well as expert testimony by a psychiatrist regarding the battered child syndrome. Finding those exclusions to be error, the Court of Special Appeals, in an unreported opinion, reversed the murder conviction but allowed the other convictions, relating to Portia, Erica, and Ashley, to stand.

We granted cross-petitions for *certiorari* to consider whether (1) on the record before it, the trial court erred in excluding evidence offered with respect to the battered child syndrome, and (2) petitioner's appellate complaint regarding a jury instruction on police deception was preserved. We shall answer both questions in the negative, and shall therefore reverse that part of the intermediate appellate court's judgment awarding a new trial on the murder charge.

## BACKGROUND

Bruno was born in 1983. He was removed from his home when he was five months old, and, after living with a great aunt for about five years, he was placed in foster care with Warren and Anna Mae Smullen, who eventually adopted him. In addition to having four children of their own, the Smullens also either adopted or, at various times, acted as foster parents for, Bruno's half-siblings Miguel, Willie, and June, and two other children, one of whom was named Carlos. Anna Mae died in 1997, and at some points not entirely clear from the record, Miguel, Willie, Carlos, and the other child left the home. The record does not indicate precisely when, or for how long, any of them resided with the Smullens. In May, 2000, the Smullen household consisted of Warren, Bruno, Warren's daughters Portia and June, and two of Warren's granddaughters, Erica (14) and Ashley (17).

Bruno was apparently a regular church-goer, and one of his avocations was participation in his church "drill team." At some point, he developed a friendship with one Shawn Williams. Warren objected to that relationship because he believed that Williams was selling drugs. On Tuesday, May 2, Bruno was supposed to be at the church drill team practice, but Portia saw him with Williams instead and reported that to Warren. When Warren, a custodian at a local middle school, returned home from work, around midnight, he went to Bruno's room, yelled at him for what he regarded as a "deception," and "grounded" Bruno by taking away his telephone privileges and forbidding him from leaving the house, at least for social pursuits.

There was no evidence that Warren assaulted or physically punished Bruno at that time. Portia and Erica said that "grounding" in that manner—loss of telephone privileges and restriction to the home and outside yard—was the normal punishment imposed by Warren. They had not observed Warren inflict corporal punishment on Bruno. Portia heard Warren say in this instance, "you don't go nowhere, you don't leave this yard." According to Bruno, Warren told him that

the only way Bruno would be leaving the house would be "in a box." The restriction was obviously not complete, as it appears that Bruno was allowed to go to school on Wednesday, Thursday, and Friday, and, according to Portia, he also went to church at some point. There was some evidence that Bruno was in the church choir.

Just before 7:00 on Saturday morning, Warren drove his daughter, June, to work, a trip that took but a few minutes. Having previously decided to kill Warren, Bruno went into the kitchen when he heard Warren and June leave, obtained a 10–12 inch butcher knife and a pair of latex gloves, and took them to his bedroom, to await his father's return.[1] Bruno waited until he saw Warren sitting on the sofa drinking his coffee and reading the newspaper, then crept up behind him, and, as noted, stabbed and cut him in the head and chest areas. The stab wounds were to the left side of the forehead, the right cheek, the left side of the face, the right side of the upper chest, the front of the chest, and the right side of the lower chest.

Portia, Erica, and Ashley were sleeping upstairs. Awakened by the noise, they went downstairs to the area between the kitchen and the living room and saw Bruno standing in the living room with a large kitchen knife. Bruno then began to chase them with the knife. Portia ran into the kitchen while Erica and Ashley fled to the living room. Bruno first followed Portia, hit her on the head with the blade of the knife, knocked her down, got on top of her, and tried to stab her in the abdomen. After a tussle as Portia attempted to grab the knife, Bruno got up and ran back in to the living room, and Portia, upon seeing her father on his knees trying to get up, ran to a neighbor's house and called 911. Portia had been cut on her hand, wrist, and head.

---

1. Bruno gave varying accounts of when he made the decision to kill his father. He first told the police that he decided to kill Warren on Tuesday night, when the "grounding" occurred. A short time later, he said that he made the decision to kill Warren on Friday night. At yet another point, he said that he did not actually decide to kill Warren until he had already begun stabbing him.

Erica saw Warren crawling on the floor in an attempt to get up and Bruno standing over him. She initially thought that Warren had simply fallen and went back upstairs but then realized that something was wrong and came back downstairs. At that point, Bruno started chasing her and stabbed her in the shoulder. She managed to get into Warren's room and close the door, but Bruno kicked the door open, grabbed her by the hair from behind, and cut her throat and face. He then left. Erica, bleeding profusely, eventually heard screams from upstairs. She grabbed Warren's phone, ran into the closet, and tried to call 911 but was unable to get through. Bruno returned, forced opened the closet door and started stabbing at her. Erica kicked him, forcing him to drop the knife. She picked it up, pointed it at him, and ran out of the house.

Ashley, clad only in her underwear, had run downstairs with the others but went back up to find her robe and then returned. She saw Bruno just standing there. When she asked what he was doing, he began to chase her. She ran upstairs into Portia's room and locked the door, but Bruno kicked it open, swung the knife at her, grabbed her hair, put her on the floor, and tried to stick her throat. She pleaded with him, and eventually, after asking Portia's whereabouts, he slammed her head against the floor and left. Ashley went downstairs, saw Warren coughing and spitting blood, and ran outside. It may have been at that point that Bruno returned to attack Erica in the closet.

Corporal Whittington, who had been to the crime scene and was thereafter instructed to search for Bruno, found him sitting on a nearby street curb with his face in his hands. After noticing a deep cut on Bruno's wrist, Whittington handcuffed him and awaited backup assistance. Upon the arrival of additional officers, Bruno was given his *Miranda* warnings, following which he told them that, after coming out of the bedroom, he saw *Portia* on top of Warren stabbing him with a knife. Bruno was taken to a hospital to have his wound examined. While there, and after being reminded of his *Miranda* rights, he stated that he had seen *Erica* on top of

Warren stabbing him with a butcher knife, that he intervened, pushed her off, and took away the knife, that Portia then entered and he pushed her with the knife. Deputy Sheriff Brown, obviously not believing that story, left the treatment room for a few minutes, returned, and, with an intent to deceive Bruno, told him that Warren was still alive and "had just told [him] that [Bruno] was the one that stabbed him."

Apparently believing that, Bruno responded, "I might as well tell you the truth." With that, Bruno said that Warren did not want him to be around Shawn Williams and that since the previous Tuesday, he and Warren had been arguing on different occasions. He said that Warren wouldn't let him leave the house and "on different occasions that his father would punch him in the chest with a piece of wood." He did not indicate when or on how many occasions this occurred or the size or nature of the wood used as a weapon. Bruno stated that "since that Tuesday, that prior Tuesday, on May 2nd he planned, he began to plan how he was going to kill his father." He added "also on that May 2nd that his father said to him that the only way he would be leaving the house would be in a box." Bruno admitted that, prior to his father's return from taking his sister to work, he got a butcher knife and a pair of latex gloves out of the kitchen, went back into his bedroom, and waited. When Warren returned, and while he sat on the couch in the living room, Bruno put on the latex gloves and "silently snuck up behind his father with the knife in his hand," that the first place he aimed for was Warren's neck and that "he repeatedly stabbed him numerous times in his head, chest, his face and his arms."

Deputy Brown informed Lieutenant Roberts that Bruno had confessed. Roberts and Deputy Forbush then entered the room. Roberts again gave Bruno the *Miranda* warnings, whereupon Bruno essentially repeated the statement he had given to Brown. At that point, Bruno was formally arrested for the murder of his father and taken to the police station for processing. Later that afternoon, after again advising Bruno of his *Miranda* rights, Roberts and Forbush interviewed him once more. The conversation was recorded. Bruno said that

the trouble started the previous Tuesday night when his father got home from work—that he came to Bruno's room and asked about Shawn. His father was angry and "telling me he was going to put me in the box," and that "I'm going to kill you the next time you leave this house." Bruno said that he did not respond but began thinking about the matter on Friday, concluding that "I might as well just get him then, that morning after when he takes my sister to work." Asked to explain that statement, Bruno said "It was like get him before he got me. Like he said like he was going to kill me . . . might as well kill him before he kills me."

Bruno repeated that he got the knife and gloves from the kitchen and waited until his father returned, that he "crept up behind him" and intended to aim for the neck, but Warren turned around, so he stabbed him in the neck, arm, head, and eye. He added that he had a pair of sweat pants in his hand to "put over his mouth, so he couldn't holler." Warren called for Portia, and, when the girls came downstairs, Bruno got into a "fighting stance" and started "swinging the knife wild and like cutting some of them." Bruno described in some detail his attacks on Portia, Erica, and Ashley, although those details are not particularly relevant to the issues now before us. When asked specifically whether he intended to kill his father, he said "[a]t first I just wanted to hurt him real bad, but when I started thinking about what I was doing . . . I was like I might as well kill him. Cause if not he will kill me." When asked about the gloves, Bruno said that he saw something on the *Matrix* show on television about using gloves for grip "and that is what I was used them for."

The battered child syndrome issue first arose during the State's case, in connection with setting a time for the appearance of the defense psychiatrist, Ellen McDaniel, who was to testify, among other things, that, because of his social history and "some of his past experiences with Warren Smullen," Bruno's psychological profile "would be consistent with him honestly and reasonably believing that there was no way out, that he had no alternative than to do what he did on May 6th of the year 2000." The State pointed out that such testimony

would be offered solely as evidence of imperfect self-defense and argued that there was no evidence and there would be no evidence that the victim was the aggressor—that Bruno was the only aggressor and, as such, could not claim either perfect or imperfect self-defense. Defense counsel responded that "because of the continued battering" and the evidence about Warren hitting Bruno in the chest, "that the deceased made a deadly overt act towards the Defendant," and that served to generate the issue of at least imperfect self-defense. The court did not rule on the matter at that time, but noted that the evidence at that point did not show any overt act on Warren's part that warranted a killing in self-defense.

An attempt was then made to produce additional evidence of abuse on the part of Warren. In cross-examining Detective Forbush regarding Bruno's statement at the hospital, counsel asked whether Bruno had said anything about Warren hitting him between Tuesday and Saturday, to which she responded that he had said nothing about being hit during that period of time but that Warren had hit him "prior times." When asked about the severity of those hittings, Bruno said that *"at one point in time* he was hit in the chest and breath was knocked out of him."  (Emphasis added). He apparently did not indicate when that occurred.

The question arose again at the beginning of the defense case. Counsel made clear that he would be arguing both perfect and imperfect self-defense based on Bruno's "psychological profile," as it would be presented by Dr. McDaniel, and that he, intended to present additional evidence of prior acts of violence on Warren's part. That evidence would be (1) to rebut testimony by Portia and Erica that Warren did not inflict corporal punishment but used "grounding" as his preferred form of punishment, and (2) to show Bruno's state of mind at the time of the murder. The court responded that, as to the second purpose, such evidence would be admissible only if Bruno was aware of the prior acts of violence and if there was evidence of some overt act demonstrating Warren's deadly intent toward Bruno, and that the latter appeared to be lacking. The court iterated that, at that point, it did not "see

a factual predicate for self-defense in this case, perfect or imperfect." [2]

The first effort to produce affirmative evidence as to Warren's abusive character came through proffered testimony from Willie Smullen, Bruno's half-brother, who had lived in the Smullen home at some undefined earlier time. Counsel proffered that Willie would testify with respect to three violent incidents: (1) at some undefined point, Warren broke furniture and slapped his wife, Anna Mae; (2) at some undefined point, he pulled a gun on another of Bruno's half-brothers, Miguel; and (3) at some undefined point, Warren and Carlos, who had lived in the Smullen house at some earlier time, were fighting and Warren pulled a gun on Carlos and shook him. Counsel proffered that Bruno had observed the incident with Carlos but did not indicate that he had seen, or even knew about, the other incidents, much less when any of them occurred.

In the absence of an overt act on Warren's part at the time of the killing or evidence that Warren was the aggressor, the court concluded again that there was no factual predicate for a self-defense argument. The same ruling was made with respect to proffered testimony from Miguel regarding those three incidents. Again, no indication was given as to when any of those incidents occurred, although it is clear from the fact that Anna Mae died in February, 1997, and from the facts that Miguel and Carlos had not lived in the Smullen house for some period of time, that they were not recent.

Similar rulings were made with respect to proffered testimony from three teachers at Bruno's school, from a custodian at the school where Warren worked, from a friend of Bruno, and from someone who, at some undefined point, had a conversation with him. Ms. Batts, a vice-principal at the

---

**2.** Whether the proffered evidence would have been admissible to rebut the testimony by Portia and Erica that Walter did *not* employ physical punishment but used "grounding" instead is not pursued in this appeal. Bruno asserts only that the evidence was admissible in support of his defense of self-defense.

school, testified that, in January, 1999—about 16 months before the murder—Bruno was suspended for fighting with another student. Counsel proffered that the witness would testify that Bruno's reaction was "severe"—that he was upset and crying and said that he could not go home, "my dad is going to kill me." Treating that again as going to imperfect self-defense, the court sustained the State's objection. An objection was sustained as well to confirmatory testimony from Mr. Harner, dean of students, that Bruno was upset about being suspended because he was afraid his father would find out and that "his father could become violent at times." We note, with respect to both of those proffers, that there was no proffer of evidence that Warren had, in fact, imposed any physical punishment on Bruno as a result of the suspension. Mr. Giddens, a guidance counselor, was prepared to testify that, after the murder, Bruno told him that Warren had said that "one of us is going to leave in a body bag." The objection was grounded on the hearsay nature of the statement as well as the lack of a foundation for imperfect self-defense.

The custodian, Mr. White, would have testified that, at some undefined time, Warren confided that he "consumed alcohol and also beat Bruno." The proffer contained no details as to how much alcohol Warren consumed, when, how, and how often he beat Bruno, or any circumstances relating to those alleged beatings. Ms. Collins, a friend of Bruno, would have testified that (1) at some undefined point, she saw two bruises on Bruno's forehead and one or more on his elbows, (2) Bruno told her that Warren was "verbally abusive" to him, and (3) Bruno indicated that "Warren would beat Bruno for things Bruno didn't do." Finally, counsel proffered that Ms. White would testify as to one conversation with Bruno, at some undefined time, in which Bruno indicated that Warren "grabbed him by the collar" and, at the time, Warren had been drinking. All of this testimony, too, was excluded.

Dr. McDaniel, after describing her methodology, began to testify regarding Bruno's psychological profile. Initially, her testimony focused on whether Bruno was able to comprehend the various *Miranda* warnings and what effect the police

deception had on the voluntariness of his inculpatory statements. The testimony in that regard was that Bruno was depressed, that he had "significant cognitive impairments," and that he was a "concrete thinker," who would take things quite literally and not "see any nuances, subtleties or symbolism in what the person says." From that, Dr. McDaniel concluded that Bruno did not understand certain of the *Miranda* warnings and was incompetent to waive them.

When it became clear that she was beginning to touch on matters relevant to the battered child syndrome, an objection was made. Counsel then proffered:

"She would render an opinion that his psychological profile would be consistent with Bruno Smullen honestly believing that he had to use the level of force that he used because he reasonably thought his life was in jeopardy and basically that there was no other way out. So it would be the analogy, to be honest with the Court, battered spouse, battered child, I was going to ask her that question."

The court sustained the State's objection to the testimony and to the written psychological profile. As noted, the issue arose on several occasions and in several contexts. Bruno relied, in part, on Maryland Code, § 10–916 of the Courts and Judicial Proceedings Article, which, under certain circumstances, makes evidence of battered *spouse* syndrome admissible in a case of perfected or attempted murder, manslaughter, or maiming, and in a case of assault with intent to murder or maim, and, in part on a common law analogy to that statute. The statute, he said, was applicable because it applied not only to a spouse and former spouse, but also to a "cohabitant, or former cohabitant," and he was a "cohabitant" in the Smullen household. The court rejected that argument, holding that "cohabitant," as used in the statute, meant someone like a spouse and did not include a child in the household. Principally, the court concluded that evidence of the syndrome was relevant only to the defense of self-defense, which required evidence that Warren was the initial aggressor—evidence of some overt act on Warren's part contemporaneous with the attack that could produce an honest, even if erroneous, belief

by Bruno that the force used was necessary, and that such evidence was lacking. For similar reasons, the court refused to give requested instructions on perfect and imperfect self-defense.

The Court of Special Appeals agreed with the trial court that § 10–916 did not encompass battered *child* syndrome and would not, therefore, of itself, make the proffered evidence admissible. The appellate court also held that no factual predicate for perfect self-defense existed—that "it was objectively unreasonable for appellant to believe he was in imminent danger of death or serious harm when he attacked Warren while he was seated on the sofa, reading the newspaper and drinking coffee." A majority of the panel concluded, however, that the normal rule applicable to self-defense, that the homicidal force be in response to a provocation by the victim, was "not applicable in the context of a defendant suffering with battered *person* syndrome." (Emphasis added).[3] It confirmed that the battered spouse syndrome and, by analogy, the battered child syndrome were not intended to create a new defense to murder but did serve to allow evidence of the syndrome when self-defense is asserted in order to prove the honesty and reasonableness of the defendant's belief that he/she was in imminent danger at the time of the offense. The syllogistic conclusion arrived at by the panel majority from this analysis was that:

> "[I]f a defendant spouse is not required to prove that the victim was the first aggressor; and if the Battered Spouse Syndrome does not represent a legislatively created new defense; and if the statute declares that certain evidence is relevant to the element of the defendant-spouse's state of mind, and if the Battered Child Syndrome is to children what the Battered Spouse Syndrome is to an adult spouse, then, in the appropriate case, it follows that a teenaged

---

3. It is unclear whether, in using this term, the Court of Special Appeals intended to broaden the battered spouse and battered child syndrome to include anyone who had previously been battered by the victim. If so, it offered no support whatever for such an extension.

defendant charged with parricide ought to be able to present evidence of past parental abuse and the Battered Child Syndrome."

The panel majority then turned to the critical question of whether Bruno had sufficiently established a basis for claiming the battered child syndrome. The majority seemed to believe that the evidence actually admitted sufficed to support the syndrome, and thus the imperfect self-defense as well—Bruno's statement to the police that Warren had beaten him "quite a bit since his mother died," that Warren had once punched him in the chest with a piece of wood, that he told Bruno that the only way he would be leaving the house would be "in a box," and that they had an argument on Friday night. The panel majority also found error in the exclusion of the other evidence "as to the history of Warren's abusive conduct."

Bruno also complained to the Court of Special Appeals about the trial court's instruction on the voluntariness of his confessions. He argued that his statements were not voluntary because of his learning disability, the inherently coercive nature of the situation, the police deception, and Dr. McDaniel's testimony that he did not understand his *Miranda* warnings and was not competent to waive them. Noting that defense counsel, though urging to the trial court that the instruction was "misleading," conceded that it was not erroneous, the appellate court concluded, as a result, that the complaint was not preserved.

The dissent took issue only with the conclusion that a sufficient predicate existed for the proffered evidence. Judge Eyler concluded that Bruno was the only aggressor—that this was a planned murder of a victim sitting in a chair reading a newspaper and the attempted murder of three other persons who had never abused him in any way. He pointed out that the battered spouse syndrome did not change the elements of self-defense and that one of those critical elements—some overt act by the victim sufficient to cause an honest belief of imminent danger—simply did not exist here.

## DISCUSSION

### Self–Defense And The Battered Child Syndrome

In essence, what led the panel majority astray was its belief that "trying to fit the Battered Spouse Syndrome and Battered Child Syndrome into the framework of traditional self-defense analysis ... is akin to trying to fit the proverbial square peg into a round hole." The panel majority attempted to resolve that perceived dilemma by effectively repealing the well-established requirement of self-defense that there be some contemporaneous overt act or threat by the victim, sufficient to instill in the defendant an honest, even if unreasonable and erroneous, subjective belief of imminent death or serious bodily injury that required the deadly response undertaken by the defendant. It equated the statutory application of the battered spouse syndrome doctrine, notwithstanding evidence that the defendant was the "first aggressor," with the notion that the doctrine, as to both spouses and children, applied as well when there was no contemporaneous act or threat which even the defendant regarded as presenting an imminent danger of harm. In that regard, the panel majority seemed to hold that syndrome evidence was admissible whenever a defendant *"contends* that he or she suffered from Battered Child Syndrome as a result of the past course of conduct of the parental figure who is the victim of the crime for which the defendant was charged." (Emphasis added).

The battered spouse or child syndrome is not inherently inconsistent with the traditional definition or elements of self-defense. It does not necessarily present the situation of a square peg and a round hole but, where applicable, merely requires a more careful and sophisticated look at the notion of imminent threat and what constitutes "aggression," of understanding that certain conduct that might not be regarded as imminently dangerous by the public at large *can* cause someone who has been repeatedly subjected to and hurt by that conduct before to honestly, even if unreasonably, regard it as imminently threatening. If, with that subjective belief, the defendant acts aggressively in defense, the defendant may be

able to show that, even though the first *apparent* aggressor, he/she was responding in self-defense to an honestly perceived imminent threat of death or serious bodily harm. The syndrome, when applied in a proper setting, can thus, depending on the circumstances, support both the subjective honesty of the defendant's perception of imminent harm and the objective reasonableness of such a perception. There is no inconsistency when the syndrome is used in that limited way. If extended beyond that, however, as the Court of Special Appeals effectively did, it then *does* become detached from the recognized defense of self-defense and assumes the status of a separate, independent defense to murder, manslaughter, maiming, or assault that we do not believe was intended by the Legislature in enacting § 10–916 and that we are not prepared to accept as part of our common law.

In analyzing the issue, we need first to look at the elements of perfect and imperfect self-defense, then to examine the nature and contour of the battered spouse and child syndromes, as they developed in the psychological, medical, and legal literature and as the former was adopted by the General Assembly in § 10–916, and finally, to see how syndrome evidence and the elements of self-defense can fit together. The ultimate question in this case, of course, is whether there was a sufficient basis for the syndrome, in either the statutory or a common law form, to apply.

### *(1) Self–Defense*

As we recently pointed out in *State v. Marr*, 362 Md. 467, 472, 765 A.2d 645, 647 (2001), Maryland recognizes two varieties of self-defense—the traditional one that we now call perfect or complete self-defense and a lesser form sometimes referred to as imperfect or partial self-defense. Perfect self-defense, we observed, is a complete defense to a charge of criminal homicide and, if credited by the trier of fact, results in an acquittal. It constitutes a justification for the killing. The elements of that defense, as explicated in *State v. Faulkner*, 301 Md. 482, 500, 483 A.2d 759, 768–769 (1984) and *Dykes*

*v. State,* 319 Md. 206, 211, 571 A.2d 1251, 1254 (1990) and re-confirmed in *Marr,* 362 Md. at 473, 765 A.2d at 648, are:

"(1) The accused must have had reasonable grounds to believe himself in *apparent* imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

(2) The accused must have in fact believed himself in this danger;

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded."

(Emphasis added).

■ Drawing from *Faulkner,* where we first recognized the concept of imperfect self-defense, we noted in *Marr:*

"The prospect of 'imperfect' self-defense arises when the actual, subjective belief on the part of the accused that he/she is in *apparent* imminent danger of death or serious bodily harm from the assailant, requiring the use of deadly force, is not an objectively reasonable belief. What may be unreasonable is the perception of imminent danger or the belief that the force employed is necessary to meet the danger, or both."

*Id.* at 473, 765 A.2d at 648 (Emphasis added).

■ Unlike perfect or complete self-defense, imperfect self-defense does not constitute a justification for the killing and does not warrant an acquittal. Its only effect is to negate the element of malice required for a conviction of murder and thus reduces the offense to manslaughter. A person laboring under the honest subjective belief that he/she was, indeed, in apparent imminent danger of death or serious bodily harm and that the force used was necessary to meet the danger cannot be found to have acted out of malice. Thus, as we said in *Burch v. State,* 346 Md. 253, 283, 696 A.2d 443, 458, *cert.*

*denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410, (1997) and confirmed in *Marr,* 362 Md. at 474, 765 A.2d at 648: "[T]he only substantive difference between the two doctrines, other than their consequences, is that, in perfect self-defense, the defendant's belief that he was in immediate danger of death of serious bodily harm or that the force he used was necessary must be objectively reasonable. In all other respects, the elements of the two doctrines are the same."

### (2) *The Battered Spouse Syndrome*

The battered spouse and battered child syndromes have different origins but in recent years have undergone a parallel development. In the context of providing support for the assertion of self-defense when the defendant (woman or child) kills an alleged persistent abuser in the absence of a contemporaneous provocation that the public at large would find indicative of an imminent threat of death or serious bodily harm, they have become recognized, by some courts and in some of the literature, as kindred doctrines.

Dr. Lenore Walker, an academic and clinical psychologist, is usually credited with first describing the battered spouse syndrome, which she called the "battered woman syndrome." *See* Lenore E. Walker, THE BATTERED WOMAN (1979); *also* THE BATTERED WOMAN SYNDROME (1984) and *Battered Woman Syndrome and Self–Defense,* 6 Notre Dame J.L. Ethics & Pub. Pol'y 321 (1992). Dr. Walker identified a "battered woman" as one who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without any concern for her rights. She described three phases to the battering cycle, which, she said, may vary in both time and intensity. Phase I she referred to as the "tension-building" phase, in which minor incidents of physical, sexual, or emotional abuse occur. The woman is not severely abused, but the batterer begins to express hostility toward her. *See* Hope Toffel, *Crazy Women, Unharmed Men, and Evil Children: Confronting the Myths About Battered People Who Kill Their Abusers, And The*

*Argument For Extending Battering Syndrome Self-Defenses To All Victims Of Domestic Violence,* 70 S. Cal. L.Rev. 337, 349 (1996), citing Walker, THE BATTERED WOMAN SYNDROME, *supra,* at 95. Phase II consists of an acute battering incident, in which the batterer "typically unleashes a barrage of verbal and physical aggression that can leave the woman severely shaken and injured." Toffel, *supra,* 70 S. Cal. L.Rev. at 349, citing Walker, THE BATTERED WOMAN SYNDROME, *supra,* at 96. Phase III is a contrition stage, in which the batterer apologizes, seeks forgiveness, and promises to change. The apparent transformation of the abuser back into a loving partner, according to Walker, "provides the positive reinforcement for remaining in the relationship." *Id.*

The essence of the syndrome is that this cycle repeats, and, indeed, Walker asserts that the syndrome does not exist unless it has repeated at least once. Worse, perhaps, than the mere repetition, is the fact that, over time, the cycle becomes more intense, more frequent, more violent, and often more lethal. *See People v. Humphrey,* 13 Cal.4th 1073, 56 Cal. Rptr.2d 142, 921 P.2d 1 (1996). One aspect of the syndrome is what had been described as "learned helplessness"—where, after repeated abuse, women come to believe that they cannot control the situation and thus become passive and submissive. *See* Toffel, *supra,* 70 S. Cal. L.Rev. at 350, citing Walker, THE BATTERED WOMAN SYNDROME, *supra,* at 45–47, 49–50. The etiology of this aspect is described in Erin Masson, ADMISSIBILITY OF EXPERT OR OPINION EVIDENCE OF BATTERED-WOMAN SYNDROME ON ISSUE OF SELF-DEFENSE, 58 ALR 5th 749, 762–763 (1998):

"Through experience, the victim learns that when she attempts to defend herself—by reaching out to others or trying to leave—that she will be the victim of more severe violence. The batterer blames the abusive relationship on her inability to respond to his ever-increasing demands so that the most effective short-term method of reducing incidents of violence is to be more subservient."

This is a key aspect in the purported relevance of the syndrome in a self-defense context, as it offers an explanation

of why the defendant, having been previously subjected to abuse, simply did not leave the home or take some other action against her abuser. In *State v. Allery,* 101 Wash.2d 591, 682 P.2d 312, 316 (1984), the court observed that expert testimony "explaining why a person suffering from the battered woman syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself would be helpful to a jury in understanding a phenomenon not within the competence of an ordinary lay person."

Another aspect of the battered spouse syndrome directly relevant in a self-defense context, is that the victim becomes able to sense the escalation in the frequency and intensity of the violence and thus becomes more sensitive to the abuser's behavior. *See* Walker, *supra,* 6 Notre Dame J.L. Ethics & Pub. Pol'y at 327–328. As described by Elizabeth Bochnak, WOMEN'S SELF-DEFENSE CASES: THEORY AND PRACTICE (1981), quoted in *Bechtel v. State,* 840 P.2d 1, 12 (Okla.Crim.1992):

"The battered woman learns to recognize the small signs that precede periods of escalated violence. She learns to distinguish subtle changes in tone of voice, facial expressions, and levels of danger. She is in a position to know, perhaps with greater certainty than someone attacked by a stranger, that the batterer's threat is real and will be acted upon."

Walker's studies indicated that retaliation by the abused woman often occurred when the cycle lapsed back from Phase III to Phase I. She noted that the women whose cases she studied felt that they simply could not cope with further assaults: "None of them stated she intended to kill her man; each said that she only wanted to stop him from hurting her more." Walker, THE BATTERED WOMAN, *supra,* at 70, quoted in *State v. Williams,* 787 S.W.2d 308, 312 (Mo.App.1990). In describing the cases in which the woman had been tried for murder, Walker recounted that several factors were common to all of the cases:

"First, each woman stated that she was convinced the batterer was going to kill her. Violent assaults had taken place previously in all of the these cases. In the final incident, however, something different was noted by these women which convinced them that the batterer really was going to kill them this time."

*Id.* at 312, quoted in *State v. Williams, supra,* at 312.[4]

Dr. Walker has opined that the battered woman syndrome constitutes a subgroup of Post–Traumatic Stress Disorder, which is recognized by the American Psychiatric Association as a mental disorder. *See* Diagnostic and Statistical Manual of Mental Disorders, American Psychiatric Association, 4th ed. § 309.81(DSM–IV), although, as critics have pointed out, DSM–IV does not, itself, mention the battered woman syndrome. Other writers have compared the battered spouse syndrome to the Stockholm syndrome of traumatic bonding, which offers an explanation of why hostages sometimes come to identify with their captors. *See* Toffel, *supra,* 70 S. Cal. L.Rev. at 351–356.

Walker's works, along with those of other researchers and clinicians, coincided with a growing awareness that domestic violence was, indeed, a serious problem that, for too long, had been ignored, or at least been given insufficient attention, by the legal, law enforcement, and social service communities, and the ensuing decades saw increasingly strident demands for both comprehensive and focused remedial action. One aspect of this was the attempt by criminal defense lawyers to offer this syndrome in support of a self-defense argument when the woman eventually reacted by killing her abuser, and one finds a burgeoning plethora of cases in the 1980's and

---

4. Critics of Walker's conclusions note that her initial (1979) findings "were based on a nonrandom sample of 110 battered women who were mostly white and middle class," although her 1984 study involved a more representative sample of 435 women. *See* John W. Roberts, *Between The Heat Of Passion And Cold Blood: Battered Woman's Syndrome As An Excuse For Self-Defense In Non–Confrontational Homicides,* 27 Law & Psychol. Rev. 135, 141 (2003), citing Paul Giannelli and Edward J. Imwinkelreid, Scientific Evidence 268 (2d ed.1993).

1990's in which courts were required to deal with the issue. Those seeking recognition of the syndrome in that context turned as well to the State legislatures, which responded, as the courts did, in different ways.

Cases in which this syndrome has been offered in support of a self-defense argument have fallen into two categories: the "confrontational" category, where the killing occurs when the defendant uses deadly force in response to a contemporaneous physical attack; and the "non-confrontational" category, where the defendant kills her partner while he is sleeping or is otherwise distracted or incapacitated. *See* Masson, *supra,* 58 ALR 5th at 764.[5] In most of the cases, the defense asserted was what, in Maryland, would constitute "perfect" self-defense, requiring not only that the defendant have harbored the honest subjective belief that she was in imminent threat of death or serious bodily harm, but that her belief be a reasonable one. The syndrome was sought to be used, through both an evidentiary foundation of antecedent abuse and expert testimony regarding the syndrome itself, to persuade the trier of fact that, under the circumstances, the woman's belief was not just real but also reasonable—that the reasonableness of her belief had to be judged through her eyes and in light of her experience.

That proved less difficult, of course, in the confrontational setting, which has been estimated to constitute about 75% of the cases,[6] where the victim was usually the initial aggressor who provoked the final confrontation that ended up lethal.

---

**5.** One writer has argued that there is a third category—that of contract killing. *See* John W. Roberts, *Between the Heat of Passion and Cold Blood: Battered Woman's Syndrome as an Excuse for Self–Defense in Non–Confrontational Homicides,* 27 Law & Psychol. Rev. 135, 144 (2003). Roberts observes that, in those cases, of a hired killer, "courts have unanimously refused to permit instructions to the jury on self-defense claims," citing Joshua Dressler, Understanding Criminal Law 241 (2001).

**6.** *See* Holly Maguigan, *Battered Women and Self–Defense: Myths and Misconceptions in Current Reform Proposals,* 140 U. Pa. L.Rev. 379, 396–97 (1991).

That element of the defense was not the real issue. The issue was more the reasonableness of the defendant's reaction, and, in those cases, the effort often proved successful, at least at the appellate level. *See,* for example, *Bechtel v. State, supra,* 840 P.2d 1; *Bonner v. State,* 740 So.2d 439 (Ala.Crim.App. 1998). The courts proved more leery in the non-confrontational setting, accounting for about 20% of the cases. There, the issue tended to focus on the reasonableness of the defendant's belief that she was in some *imminent* danger when the defendant was not, at the moment, directly confronting her and may, as noted, even have been sleeping or completely passive at the time. *See Com. v. Grove,* 363 Pa.Super. 328, 526 A.2d 369 (1987).

Defenses of this kind do not always remain neatly in their original boxes. Apart from the issue of its applicability in the non-confrontational setting, questions arose whether the syndrome was limited to wives trapped in a marital relationship with their abuser or included as well ex-spouses and women involved in less formal relationships, whether it included males subject to repeated abuse by female partners, whether it included children who killed abusive parents, or elderly or dependent parents who killed abusive children, or same-sex persons involved in a homosexual communal relationship, whether it included anyone involved in a relationship with a persistent abuser. These questions surfaced in Maryland when, in 1991, the General Assembly considered legislation (H.B. 49, which was enacted, and S.B. 141, which passed but was vetoed) that officially recognized the battered spouse syndrome.[7]

The bill, as introduced and as enacted, used the term "battered spouse syndrome," which, in § 10–916(a), was defined as "the psychological condition of a victim of repeated

---

**7.** Similar bills had been filed in the 1989 and 1990 sessions but failed in the respective Senate and House committees. In written testimony given on H.B. 49, Judith Wolfer, representing the House of Ruth, a shelter for battered women, as well as the Public Justice Center and the Maryland Network Against Domestic Violence, noted that the bill was the result of three years of effort by a broad-based coalition.

physical and psychological abuse by a spouse, former spouse, cohabitant, or former cohabitant which is also recognized in the medical and scientific community as the 'battered woman's syndrome.' " Evidence was offered to the legislative committees that, although that syndrome had been recognized in a number of other States, there was no controlling Maryland precedent and some judges were allowing evidence of the syndrome while others were not. The intent of the bill, according to the Senate Judicial Proceedings Committee Floor Report on H.B. 49, was to "clarify that the court *has discretion* to admit evidence of repeated physical and psychological abuse of the defendant by the alleged victim and expert testimony on the battered spouse syndrome." (Emphasis added). The bill achieved that purpose through § 10–916(b), which provides:

"Notwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when the defendant raises the issue that the defendant was, at the time of the alleged offense, suffering from the Battered Spouse Syndrome as a result of the past course of conduct of the individual who is the victim of the crime for which the defendant has been charged, the court *may* admit for the purpose of explaining the defendant's motive or state of mind, or both, at the time of the commission of the alleged offense:

(1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by an individual who is the victim of a crime for which the defendant has been charged; and

(2) Expert testimony on the Battered Spouse Syndrome."

(Emphasis added).

It is clear, from both the language of the bill and its legislative history, that the law was intended to cover only the battered spouse syndrome as then generally recognized. Although the bill used the terminology "battered *spouse* syndrome," it made clear that it was applicable as well to former spouses, cohabitants, and former cohabitants, and was equated

with the broader term "battered woman's syndrome." There is no indication, however, that, by including "cohabitants" and "former cohabitants," the bill was intended to apply beyond the adult domestic relationship. John Brumbaugh, a distinguished professor of criminal law and evidence at the University of Maryland Law School, advised the sponsor of the companion Senate Bill, and through him, the Senate Judicial Proceedings Committee, that the bill was too limited—that "the situation is broader than that of the battered spouse, and includes battered children and battered parents, for example." The implicit suggestion to so broaden the bill was rejected.

The other written testimony offered in support of the bill focused on the plight of battered "women" and spouses. The letter from Judith Wolfer, who apparently had a hand in drafting the legislation, is particularly germane in this regard. She regarded the bill as applying to abuse of the defendant "by his or her partner" and described the syndrome in much the same way that Dr. Walker had done years earlier. She stated that "the cyclical nature of an intimate battering relationship enables a battered spouse to become expert at recognizing the warning signs of an impending assault from her partner—signs frequently imperceptible to outsiders."

A second pertinent limitation, explicit in the statute and well-documented in its legislative history, is that the admission of battered spouse syndrome evidence is discretionary with the court. The statute says that the court "may" admit this evidence, and the Senate Judicial Proceedings Floor Report makes clear that admission was intended to be discretionary. Ms. Wolfer noted that limitation in her testimony: "House Bill 49 does NOT require the court to admit this evidence in every case. The bill has been purposefully written in permissive language ..." Suggestions to make admission mandatory were made and rejected. Congresswoman Constance Morella wrote to the House Judiciary Committee that "Maryland judges must be *required* to admit evidence of battering and expert testimony on battered woman's syndrome in criminal cases in which the defendant is a battered

woman." (Emphasis added). The Legislative Office of Maryland NOW, the Women Legislators of Maryland, and Ms. Wolfer, on behalf of her three organizations, were content with the permissive language, however, and that, as noted, is how the statute is worded.[8]

### (3) The Battered Child Syndrome

The battered child syndrome has an earlier origin and had a different initial purpose. It was first described by Drs. C. Henry Kempe, Frederic N. Silverman, Brandt F. Steele, William Droegemueller, and Henry K. Silver in *The Battered Child Syndrome*, 181 JAMA 105 (1962) as "a clinical condition in young children who have received serious physical abuse." The syndrome, they argued, was relevant in establishing that certain kinds of injuries suffered by young children were the result of child abuse rather than being accidental, and they urged that the syndrome "should be considered in any child exhibiting evidence of fracture of any bone, subdural hematoma, failure to thrive, soft tissue swellings or skin bruising, in any child who dies suddenly, or where the degree and type of injury is at variance with the history given regarding the occurrence of the trauma." *Id.*

The syndrome posited by the authors had nothing whatever to do with a self-defense argument by a parent-killing child, but focused entirely on identifying child abuse. The authors state that "[t]he BATTERED–CHILD SYNDROME is a term used by us to characterize a clinical condition in young chil-

---

**8.** This discretionary aspect must be taken with some caution. If, because an adequate foundation for it has been established, syndrome evidence is relevant and is properly offered, the court *must* admit it, first, because Maryland Rule 5–402 makes clear that, unless rendered inadmissible by other law, all relevant evidence is admissible, and second, because a defendant has a Due Process Constitutional right to mount a defense and have considered relevant and admissible evidence in support of that defense. The discretion is the normal one accorded to trial judges to determine whether particular evidence is, indeed, relevant under Rule 5–401 and not unduly prejudicial or misleading under Rule 5–403. The legislative intent, we think, was simply to preserve *that* discretion and make clear that judges were not required to admit this evidence in all cases, simply because it was offered.

dren who have received serious physical abuse, generally from a parent or foster parent" and that "it is frequently not recognized or, if diagnosed, is inadequately handled by the physician because of hesitation to bring the case to the attention of the proper authorities." *Id.* at 105. They observed that "[t]he battered child syndrome may occur at any age, but, in general, the affected children are younger than 3 years." *Id,* at 105. Clinical manifestations of the syndrome, they said, "vary widely from those cases in which the trauma is very mild and is often unsuspected and unrecognized, to those who exhibit the most florid evidence of injury to the soft tissues and skeleton." *Id.* They advised that "[p]sychiatric knowledge pertaining to the problem of the battered child is meager, and the literature on the subject is almost nonexistent." *Id.* at 106.

We recognized that function of the syndrome in *Bowers v. State,* 283 Md. 115, 118, 389 A.2d 341, 343–344 (1978), a child abuse case. *See also* John E. Myers and Linda E. Carter, *Proof of Physical Child Abuse,* 53 Mo. L.Rev. 189 (1988).

Application of this syndrome to a self-defense argument in parricide cases [9] would seem to be more a lateral extension of the battered spouse syndrome than a direct expansion of the battered child syndrome described by Dr. Kempe *et al.* in the JAMA article.[10] *See Jahnke v. State,* 682 P.2d 991, 996

---

9. For convenience, but not for purposes of limitation, we shall describe these cases as parricide or parent-killing, although occasionally the victim is not a parent but some other authority figure in the home—the mother's boyfriend, for example.

10. Application of the battered child syndrome to parricide cases does not seem to be inconsistent with its original function. Dr. Kempe has since noted that the problem was not one involving just physical injury, but that, except for children who were actually killed or endured permanent brain damage, "the most devastating aspect of abuse and neglect is the permanent adverse effects on the developmental process and the child's emotional well-being." Steven R Hicks, *supra,* 11 L. & Psychol. Rev. at 111, citing R. Helfer & C. Kempe, HELPING THE BATTERED CHILD AND HIS FAMILY (1972). Kempe continued that the term "battered child syndrome" had served its purpose in generating a higher level of awareness but failed to encompass properly the full scope of the abused child's predicament, and he recommended dropping the term in favor

(Wyo.1984) (noting that while cited cases involved homicides committed by women who were perceived as being victims of the battered spouse syndrome, "there is no reason to distinguish a child who is a victim of abuse"); *State v. Janes,* 121 Wash.2d 220, 850 P.2d 495, 502 (1993) ("Given the close relationship between the battered woman and battered child syndromes, the same reasons that justify admission of the former apply with equal force to the latter."); Jamie H. Sacks, *A New Age of Understanding: Allowing Self–Defense Claims for Battered Children who Kill their Abusers,* 10 J. Contemp. Health L. & Pol'y 349, 351 (1994) ("Courts are slowly recognizing that women and children should be treated similarly when they murder after years, or a lifetime, of family violence."); Steven R. Hicks, *Admissibility of Expert Testimony on the Psychology of the Battered Child,* 11 L. & Psychol. Rev. 103, 106 (1987); Diana J. Ensign, *Links Between the Battered Woman Syndrome and the Battered Child Syndrome: An Argument for Consistent Standards in the Admissibility of Expert Testimony in Family Abuse Cases,* 36 Wayne L.Rev. 1619 (1990); Joelle A. Moreno, *Killing Daddy: Developing a Self–Defense Strategy for the Abused Child,* 137 U. Pa. L.Rev. 1281 (1989); Kristi Baldwin, *Battered Child Syndrome as a Sword and a Shield,* 29 Am. J.Crim. L. 59 (2001).

Support for this view comes not just from brief general statements declaring the two syndromes analogous, but also from ascribing to the form of battered child syndrome sought to be applied in parricide cases at least three of the elements found in the battered spouse syndrome—repeated physical abuse, the "learned helplessness" that, in some circumstances, may account for the failure of the victim to strike back during a confrontation or to take other steps to avoid the problem,[11]

---

of the more inclusive term "child abuse and neglect". Steven R. Hicks, *supra,* 11 L. & Psychol. Rev. at 111.

**11.** Although a number of writers list learned helplessness as an element of battered child syndrome, others point out that the need for expert testimony on that element may not be as great when dealing with battered children. Juries will understand that, quite apart from any

and a heightened vigilance and sensitivity to signs of impending violence that would not likely be apparent to anyone else. Hicks points out:

> "Battered children, unlike those children who are not abused, live in an environment where abuse is commonplace and may occur at anytime with or without warning. Battered children, therefore often appear to be what researchers have termed as 'hypervigilant.' Such a hypervigilant child is acutely aware of his or her environment and remains on the alert for any signs of danger, events to which the unabused child may not attend. The child's history of abusive encounters with his or her battering parent leads him or her to be overly cautious and to perceive danger in subtle changes in the parent's expressions or mannerisms. Such 'hypermonitoring' behavior as it has been termed, means the child becomes sensitized to these subtle changes and constantly 'monitors' the environment (particularly the abuser) for those signals which suggest danger is imminent."

Hicks, *supra,* 11 L. & Psychol. Rev. 103–04. This is virtually identical to the heightened awareness possessed by battered women, as described by Bochnak, *supra,* and recognized by the Oklahoma court in *Bechtel v. State, supra,* 840 P.2d at 12.

There appears to be one important difference between battered spouse killings and battered child killings, however; whereas, as noted, most killings by women claiming the effect of battered spouse syndrome occur in confrontational settings, most killings by abused children occur in non-confrontational settings, in ways that suggest an ambush. *See* Paul A. Mones,

---

psychological impediments, children are not legally free and usually not practically free to leave the home. Hicks points out that the inability of a woman to strike back because of fear of reprisal applies even more compellingly to children. He notes: "For children, the feeling of loss of power and hopelessness is more fact than fantasy. A child who exists in an environment of unprovoked acts of violence (often perpetrated by both parents) truly has no place to turn. Furthermore, the child's early experiences have not instilled the confidence, or basic sense of trust upon which the child can draw, to muster the courage to seek assistance." Hicks, *supra,* 11 L. & Psychol. Rev. at 124.

WHEN A CHILD KILLS: ABUSED CHILDREN WHO KILL THEIR PARENTS 14 (1993). Mones writes:

"Despite the passivity that has marked these children's lives, the parricides are frequently carried out in a brutal, calculating manner. The homicides typically occur when the parent is in his least defensible position, thus increasing the child's chance of success. The circumstances of the killing, in fact, often suggest an ambush, with the parent sleeping, coming in the front door, watching TV, or cooking dinner with their back turned when attacked. Rarely is the parent ever killed while beating, or for that matter, yelling at the child. The vast majority of perpetrators concoct some plan and often discuss their intentions with friends days or weeks before the actual killing. A particularly disturbing characteristic of these homicides is what police refer to as the 'overkill factor.' Only rarely is the parent killed with a single clean shot; most often the child will shoot, club, or stab the parent numerous times."

Adolescents, in particular, Mones reports, "are particularly susceptible to lashing out against abuse." *See also* Paul Mones, *Parricide: Opening a Window Through the Defense of Teens Who Kill,* 7 Stan. L. & Pol. Rev. 61, 63 (Winter, 1995–96).[12]

As we shall discuss, this setting severely strains, and in many cases will rupture, the relationship between the syndrome and the defense of self-defense, perfect or imperfect.

---

**12.** These findings have been iterated in many subsequent journal articles, but most of those cite or trace back, ultimately, to Mones and do not present any other original research. *See,* for example, Jamie Sacks, *A New Age of Understanding: Allowing Self–Defense Claims for Battered Children Who Kill Their Abusers,* 10 J. Contemp. Health L. & Pol'y 349, 357–58 (1994), Susan Smith, *Abused Children Who Kill Abusive Parents: Moving Toward an Appropriate Legal Response,* 42 Cath. U.L.Rev. 141, 154–55 (1992); Merrilee Goodwin, *Parricide: States Are Beginning to Recognize that Abused Children Who Kill Their Parents Should Be Afforded the Right to Assert a Claim of Self–Defense,* 25 Sw. U.L.Rev. 429 (1996); Robert Hegadorn, *Clemency: Doing Justice to Incarcerated Battered Children,* 55 J. Mo. B. 70 (1999). Although mere uncritical repetition does not make Mones's findings valid, the lack of contrary evidence in the literature does lend credibility to them.

### (4) Recognition of These Syndromes

Most appellate courts that have considered these syndromes have quite properly regarded them as in the nature of novel scientific theories and thus have subjected them to analysis under *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923) (or, for those that have made the switch, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) or *Dyas v. United States,* 376 A.2d 827 (D.C.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977)) and under their analogue to Fed. Rule of Evidence 702. *Frye* establishes that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye,* 293 F. at 1014. In *Reed v. State,* 283 Md. 374, 381, 391 A.2d 364, 368 (1978), we confirmed our allegiance to the *Frye* test, which we regarded as meaning that "before a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field."

We are spared having to deal with *Frye* with respect to the battered spouse syndrome, as the General Assembly, by enacting § 10–916, has made evidence relating to that syndrome admissible, under the circumstances set forth in the statute. *See Armstead v. State,* 342 Md. 38, 54, 673 A.2d 221, 228–229 (1996) (novel scientific evidence may be admissible either under a *Frye* analysis or by statute). It is clear, however, even without the statute, that the battered spouse syndrome has become generally accepted in the psychological community and, by now, has been recognized as such by most of the courts in this country that have had occasion to consider it. Acceptance of the battered child syndrome, in this context, is far more hesitant and much more recent.[13] In *State v. Nem-*

---

13.  A number of courts have declared the battered child syndrome to be an accepted *medical* diagnosis, but those cases involved the killing of a

*eth,* 82 Ohio St.3d 202, 694 N.E.2d 1332, 1335 (1998), the court, though recognizing the doctrine, noted that, although the battered child syndrome had long been accepted by the medical community to provide proof of child abuse, many courts had been "reluctant to allow evidence on the psychological effects of battered child syndrome because they do not believe that there is sufficient scientific proof that psychological markers can in and of themselves identify a battered or abused child." Indeed, there is far more ferment in the literature, especially in student notes and comments, than the number of judicial decisions would seem to warrant.

Despite the early reluctance by the courts, especially in non-confrontational settings of the kind described by Mones, and notwithstanding that the *Nemeth* court recognized the doctrine and allowed evidence of it under the *Daubert* test, rather than the *Frye* test, there is an increasing judicial acceptance of the syndrome based on its medical or psychological credentials. The clearest acceptance, under *Frye,* came in *State v. Janes,* 121 Wash.2d 220, 850 P.2d 495, 503 (1993) ("[W]e conclude that the battered child syndrome is the functional and legal equivalent of the battered woman syndrome, and find that it is admissible under the *Frye* test."). *See also State v. Hines,* 303 N.J.Super. 311, 696 A.2d 780 (1997) (recognizing an equivalent doctrine under the guise of post traumatic stress disorder); *Appeal in Maricopa County,* 182 Ariz. 60, 893 P.2d 60 (App.1994); and *cf. People v. Colberg,* 182 Misc.2d 798, 701 N.Y.S.2d 608 (Co.Ct.1999), (recognizing syndrome with respect to killing of adult child by battered parent).

---

young child, and it appears that the court was relying on the acceptance in the medical community of Dr. Kempe's initial conception of the syndrome, as an indicator of child abuse, rather than as an extension of the battered spouse syndrome in support of a self-defense argument. *See,* for example, *United States v. Boise,* 916 F.2d 497, 503–504 (9th Cir.1990); *Com. v. Day,* 409 Mass. 719, 569 N.E.2d 397, 400 (1991); *People v. Barnard,* 93 Mich.App. 590, 286 N.W.2d 870, 871 (1979); *State v. Hernandez,* 167 Ariz. 236, 805 P.2d 1057, 1059–1060 (App.1990). Those cases are not particularly relevant.

■ We need not engage in the semantics of determining whether the psychological/psychiatric community generally recognizes the battered child syndrome, in the context at issue here, as something separate and distinct from the battered spouse syndrome. Clearly, the syndrome described by Dr. Kempe has become well-accepted in both the medical and legal community. More important, the psychological aspects of that syndrome are in harmony with the psychology of the battered spouse syndrome, which has independently gained wide acceptance in the psychological and legal communities. From a *Frye* perspective, we think it more appropriate simply to conclude that the elements of the battered spouse syndrome that can help to explain why a battered woman may perceive imminent serious harm from conduct that would not likely be regarded as imminently threatening by someone else and may regard her conduct as necessary to meet that threat apply equally with respect to battered children.

■ Although we are not prepared at this point to recognize a battered *person* syndrome, because we know not where that may lead, we do hold that the battered spouse syndrome, as recognized in § 10–916, applies as well to battered children. The underpinnings of that application, we believe, have been generally accepted in the psychological and legal communities and are therefore reliable. For convenience, we shall continue to refer to the "battered child syndrome," as that has become the term of art, but we conceive of it simply as part of an expanded scope of the statutory battered spouse syndrome.

### (5) *This Case*

■ Recognition of the battered child syndrome under *Frye* is not the only hurdle that needs to be overcome. Even reliable evidence is admissible only if it is relevant in the particular case, *i.e.,* if it has a tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence. Maryland Rules 5–401 and 5–402. The requirement of relevance applies not just to factual evidence but to expert testimony as well. Testimony by experts is admissible

only if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, and, in making that determination, the court must decide, among other things, "whether a sufficient factual basis exists to support the expert testimony." Maryland Rule 5–702. The question, in this regard, is whether an issue of consequence in this case was sufficiently generated to which the proposed evidence would be relevant.

We have described the various proffers made by Bruno—predominantly his extra-judicial statements to various people indicating that Warren had physically abused him at various times in the past and, on the Tuesday preceding the killing, had "grounded" him and told him that the only way he would leave the house would be "in a box," and Dr. McDaniel's description of the battered child syndrome. Apart from the hearsay issues regarding Bruno's statements, the question is the relevance of that evidence. The posited relevance was to support a theory of self-defense, but that hinged on whether, if admitted and credited by the jury, that evidence would, indeed, support such a defense.

As we have indicated, the two elements common to both perfect and imperfect self-defense in Maryland are that the defendant must have, in fact, believed himself in apparent imminent and immediate danger of death or serious bodily harm from his assailant and that the accused must not have been the aggressor or provoked the conflict. Perfect self-defense requires, in addition, that the accused have had reasonable grounds for perceiving the apparent imminent or immediate danger and that the force used must not have been unreasonable, *i.e.*, more than the exigency demanded. In *State v. Marr, supra,* 362 Md. at 479, 765 A.2d at 651, we accepted the notion that, as part of a general self-defense analysis and without regard to the assertion of any battered spouse or battered child syndrome, "the trier of fact must look at the circumstances as they appeared to the defendant, for that is important in understanding the defendant's explanation for his or her conduct." We added that it "provides the

necessary underpinning for the defendant's subjective beliefs that (1) he/she was in imminent danger, and (2) the force used was necessary." *Id. See also Gunther v. State,* 228 Md. 404, 179 A.2d 880 (1962) (where defendant shot victim as victim jumped into defendant's car as defendant was dropping his sister off at her home, knowledge by defendant that victim had repeatedly and severely assaulted his sister and that victim always carried a gun supported request for jury instruction that defendant had right to arm himself in anticipation of attack); *Bennett v. State,* 230 Md. 562, 188 A.2d 142 (1963) (same).

We pointed out in *Marr,* however, that, when judging the reasonableness of the defendant's conduct in a perfect self-defense analysis, that notion has some limits. The fact that the defendant's perception either of imminent harm or the amount of force necessary to deal with the threat is inaccurate does not necessarily make the perception unreasonable, for "human beings often misunderstand their surroundings and the intentions of other people." *Id.* at 481, 765 A.2d at 652. In that regard, we observed that, if the defendant is confronted by a person with a gun, he may reasonably, even if incorrectly, believe that the gun is loaded and presents an imminent danger and shoot the person in self-defense. If, however, on Halloween the defendant confronts a costumed stranger and shoots him in the honest belief that the stranger is an alien from Mars intent on his immediate destruction, "the jury is not entitled to judge the reasonableness of the defendant's conduct on the assumption that the victim was, in fact, an alien from Mars intent on harming the defendant." *Id,* at 481–82, 765 A.2d at 652.

These concepts enunciated in *Marr*—that, within reason, the trier of fact must look at the circumstances as they appeared to the defendant—provide the foundation for the required analysis. As we have observed, the battered spouse/child syndrome is founded upon a repetitive and increasingly frequent and severe cycle of violence that creates a hypervigilance on the part of the defendant and attunes the defendant to recognize a threat of imminent danger from conduct that

would not appear imminently threatening to someone who had not been subjected to that repetitive cycle of violence. It is the psychological response to that cycle of violence that helps explain why the defendant perceived a threat from objectively non-threatening conduct on the part of the victim and why, though *apparently* the aggressor, the defendant was actually responding to perceived aggression by the victim.

We start here from the premise that the *objective* evidence demonstrated a classic first degree premeditated murder. Bruno decided in advance to kill his father on Saturday morning; he made careful preparations to do so; and he carried out his attack by stealth, creeping up behind Warren while the father was sitting on the couch reading a newspaper. Coupled with that is (1) the absence of any evidence of any provocation by Warren since the preceding Tuesday, when Warren yelled at and grounded" Bruno for being with Williams when he was supposed to be at church, and (2) the fact that Bruno also assaulted Portia and attempted to murder Erica and Ashley, who had never abused him in any way and presented no discernible (or alleged) threat to him.

What evidence was offered by Bruno that might support a conclusion that he was suffering from battered child syndrome and thus provide an explanation of how and why he perceived the threat of imminent death of serious bodily harm from Warren? There was no evidence, either admitted or proffered, of the kind of repetitive cycle of violence that lies at the heart of the syndrome. No one ever saw Bruno being assaulted by Warren or exhibiting any injuries from such an assault. The persons most likely to witness either an assault or the effect of an assault would have been the persons living in the house—Portia, June, Ashley, Erica, Carlos, Miguel, and Willie—and none of them testified to, or proffered any testimony of, any such conduct involving Bruno. The women expressly denied that Warren ever inflicted corporal punishment on Bruno; Willie and Miguel would have testified to isolated and separate incidents involving Miguel, Carlos, and Anna Mae, only one of which Bruno may have witnessed. There was nothing in the proffers to indicate when those incidents oc-

curred or what the circumstances were. The only evidence that even remotely might corroborate an assault would have come from Ms. Collins, who apparently saw Bruno at some undefined point with some bruises on his forehead and elbow—bruises that were in no way linked to any assaultive conduct on Warren's part.

The only admitted or proffered evidence regarding assaults on Bruno came from hearsay statements he or Warren made, but, except for an incident, for which no time was established, when Warren allegedly hit Bruno in the chest with a piece of wood, these statements were all very general, wholly unspecific as to nature, severity, time, or circumstances. There was no evidence that Bruno ever required, or even sought, medical attention; there was no evidence that any teacher or other school official, or anyone at the church that Bruno regularly attended, ever noticed bruises, cuts, or other physical trauma. That Bruno was afraid to go home after being suspended for fighting with another student 16 months before the killing hardly qualifies as a basis for battered child syndrome.

This paucity stands in stark contrast to the kind, intensity, and severity of behavior that courts *have* found sufficient to allow evidence of battered child syndrome. In *State v. Janes, supra,* 121 Wash.2d 220, 850 P.2d 495, the defendant had been subjected to "chronic and enduring abuse" for a period of ten years, since he was a small child. At nine, he was hit with a belt or wire hanger and a piggy bank; he was hit in the mouth with a mop; at ten, the abuser smashed his stereo with a sledge hammer; he was punched in the face for failing to complete a homework assignment; twice he was struck in the head, rendering him unconscious, once with a piece of firewood; school officials noticed signs of abuse; he was threatened, as punishment, with having his fingers placed on a hot wood stove or broken with a hammer, or having a crowbar wrapped around his head. *Id.* 850 P.2d at 498–499. Even with all of that, the Washington Supreme Court did not find that a self-defense instruction was required as a matter of law but remanded the case for the trial court to consider whether that evidence warranted a self-defense instruction.

In *State v. Nemeth, supra,* 82 Ohio St.3d 202, 694 N.E.2d 1332, testimony by the defendant, corroborated by other evidence, showed that his mother, the victim, would drink to excess several nights a week, that when she got drunk, she would hit, slap, and psychologically abuse him, on one occasion she burned his hand with a cigarette, on another, she cut him with a coat hanger, she hit him across the back with a stick and threw things at him, she spent hours at night pounding and kicking on his bedroom door so that he trembled in fear and could not sleep, there was a violent episode the night he killed her. *Id.* 694 N.E.2d at 1333–1334. In *State v. Hines, supra,* 303 N.J.Super. 311, 696 A.2d 780, there was evidence that the female defendant had been sexually abused by her father on a regular basis, often by force, from the time she was nine until she moved from the house at the age of 13. From the time she was eleven, the abuse took the form of sexual intercourse. The case studies reported by Paul Mones (*see* WHEN A CHILD KILLS, *supra*) and others in support of recognizing the syndrome are replete with long histories of persistent physical, psychological, and sexual abuse of the worst kind.

When a defendant claiming self-defense offers foundational evidence which, if believed, would establish the requisite pattern of abuse sufficient to provide a base for an expert opinion as to the battered spouse/child syndrome, it should be admitted, so that it can be followed by the expert testimony. The syndrome evidence would then play its proper role in explaining why and how, in light of that pattern of abuse, the defendant could honestly, and perhaps reasonably, perceive an imminent threat of immediate danger. To permit that kind of evidence in a case such as this, however, would detach the syndrome from its proper mooring and allow the jury to find that random and undefined acts of abuse perpetrated at undefined times in the past, none of which apparently caused serious physical injury, or required any medical attention, or attracted the notice of anyone in a position to notice them, can reduce a classic premeditated murder to manslaughter or acquittal. If used in that setting, the syndrome would, indeed,

constitute an independent defense and assume a significance unsupported by the psychological pillars upon which it properly rests. We recognize the doctrine, but there was no evidentiary basis for it in this case.[14]

### Jury Instruction

As noted, in his initial statements to the police, Bruno said first that Portia and then that Erica had stabbed Warren. It was only after Deputy Sheriff Brown left the hospital treatment room, returned a few minutes later, and told Bruno that Warren was still alive and had said that Bruno was the assailant that Bruno confessed. Bruno had already been given his *Miranda* warnings once and had been reminded of them before he made his inculpatory statement.

In the Circuit Court, Bruno's principal challenge to the confession, based largely on testimony by Dr. McDaniel, was that, because of his various impairments, he was psychologi-

---

**14.** Noting that only "some" evidence is necessary to establish a foundation for the battered child syndrome, the dissent takes us to task for not recognizing the scattered indefinite hearsay assertions as qualifying as that "some" evidence. The dissent complains as well that we are requiring corroboration of the defendant's hearsay statements.

Taking the second complaint first, we are doing no such thing. We simply point out that, not only do the defendant's statements not support the existence of a battered child syndrome, as defined and recognized by the courts, but that there was no other evidence to support it and that the persons who most likely were in a position to observe the kind of abuse necessary to establish the syndrome denied that it ever occurred.

We accept that only "some" evidence is required to generate the issue, but it has to be evidence which, if believed, could, indeed, support the existence of the syndrome. Under the dissent's view, a defendant who, like Bruno, with classic premeditation murders a parent could generate an issue of self-defense simply by offering hearsay statements that he had been spanked by the parent on various undefined occasions over the past decade and was afraid that the parent might, at some point in the future, spank him again. It is important to keep in mind that, in the present context, the battered spouse or child syndrome is merely in aid of establishing perfect or imperfect self-defense. The dissent falls into the same trap as the Court of Special Appeals by effectively regarding the syndrome as an independent defense, dependent only on its own elements and detached from the criteria necessary to establish self-defense.

cally unable to understand any of the *Miranda* warnings other than the right he had to an attorney. Nonetheless, the issue of Deputy Brown's deception—his telling Bruno that Warren was still alive and had accused Bruno of being the assailant—was presented. The circumstances under which Bruno made his confessions was the subject of much testimony, Deputy Brown was cross-examined about his misstatement to Bruno, and Dr. McDaniel gave weight to it in her analysis of Bruno's competence to waive his *Miranda* rights.

In its instructions to the jury, the court noted that Bruno had made statements to the police and made clear that the State was required to prove, beyond a reasonable doubt, that those statements were voluntary. In accord with *Maryland Criminal Pattern Jury Instruction* 3.18, the court stated that, to be voluntary, the confession must not have been compelled or obtained as a result of any force, promises, threats, inducements or offers of reward, and that, in deciding whether the statements were voluntary, the jury must consider "all the circumstances surrounding the statement, including the conversations, if any, between the police and the Defendant." Apparently at the State's request, the court concluded its instruction on voluntariness with the additional statements that "deception by the police to the Defendant is considered a valid weapon of the police arsenal" and "[t]he fact that the Defendant may have been deceived by the police does not make any statement involuntary."

Upon completion of the instructions, defense counsel suggested to the court that the instruction on police deception "is cumulative and unnecessary as there's already a sentence in the pattern jury instruction going to police conduct, the police talking with the Defendant." The court asked "is your objection that it's cumulative rather than it's a—do you contend that it's a misstatement of the law," to which counsel replied:

"I'm not going to necessarily contend it's a misstatement of the law, but I think it's unnecessary and I think it's potentially misleading because it's giving more weight, in other words each factor is listed under pattern jury instruction and this kind of, this one included says, well, this one

included the arguments made to the jury places too much emphasis on that while they're looking at the other inference as well."

The court responded that "there is a factual basis in this case where there was deception used and it seems to me that the pattern instruction may not be adequate to cover that when that issue is generated by the facts in this case." No further argument was made, and the exception was denied.

In the Court of Special Appeals, Bruno contended not that the instruction was cumulative or unnecessary but that it was legally incorrect, in that it "conveyed to the jurors that they should not consider deception, because 'the fact that the Defendant may have been deceived by the police does not make any statement involuntary'" and that, "[i]n context, the court's instruction took the variable of deception out of the juror's consideration of voluntariness. The effect was error." That is a very different argument than the one made to the trial court. At trial, counsel conceded that the instruction did *not* constitute a misstatement of the law but was concerned only that it was cumulative and was already covered by the other instructions. He never claimed that the instruction was, itself, erroneous. On appeal, the claim was made that the instruction was substantively erroneous in that it served to withdraw the deception from consideration of voluntariness. The Court of Special Appeals was correct in concluding that the issue raised on appeal had not been presented to the trial court and had therefore not been preserved for review.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSING CONVICTIONS FOR FIRST AND SECOND DEGREE MURDER REVERSED; CASE REMANDED TO COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO AFFIRM JUDGMENT OF CIRCUIT COURT FOR WICOMICO COUNTY; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.

Dissenting opinion by RAKER, J., which BELL, C.J. and ELDRIDGE, J., join.

RAKER, Judge, with whom BELL, Chief Judge and ELDRIDGE, Judge, join, dissenting.

I would affirm the judgment of the Court of Special Appeals and hold that the trial court erred as a matter of law in refusing to admit Smullen's evidence on the Battered Child Syndrome and to instruct the jury as to self-defense. I agree with the majority's well-reasoned discussion of the Battered Spouse Syndrome and the Battered Child Syndrome and the interrelationship between the two syndromes. I respectfully dissent, however, from the holding of the Court that respondent did not generate sufficient evidence to raise the defense of self-defense.

In order to generate the issue of self-defense and entitle a defendant to an instruction on either perfect or imperfect self-defense, the defendant has the burden of initially producing *some* evidence. *See General v. State*, 367 Md. 475, 486–87, 789 A.2d 102, 108–09 (2002); *State v. Martin*, 329 Md. 351, 358–59, 619 A.2d 992, 995–96, *cert. denied*, 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993); *Dykes v. State*, 319 Md. 206, 216–17, 571 A.2d 1251, 1256–57 (1990); *Simmons v. State*, 313 Md. 33, 39–40, 542 A.2d 1258, 1261 (1988); *State v. Evans*, 278 Md. 197, 207–08, 362 A.2d 629, 635 (1976). In *Dykes*, we made clear that "some evidence" is not strictured by the test of a specific standard and that "some" means no more than what it says, merely some, as understood in everyday usage. We said:

"The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense."

*Id.* at 217, 571 A.2d at 1257.

The question of whether there is sufficient evidence to raise a claim of self-defense is a question of law for the trial court,

which must apply a subjective standard, viewing the evidence from the perspective of the defendant at the time of the killing. *See Dykes,* 319 Md. at 221, 571 A.2d at 1259. Imperfect self-defense, or partial self-defense, requires that the defendant subjectively believed that the actions taken were necessary for his or her safety; perfect or complete self-defense requires that, objectively, a reasonable person would so consider them. Imperfect self-defense requires no more than a subjective honest belief on the defendant's part that the homicidal actions were necessary for his or her safety, even though objectively, the actions would not be found to be so. *Id.* at 213, 571 A.2d at 1255.

The trial court held, following an offer of proof, that evidence of the Battered Child Syndrome could not, as a matter of law, support a finding of self-defense, perfect or imperfect, because, it concluded, there was no "imminent threat" to respondent at the time of the killing. The court excluded the testimony and refused to instruct the jury on the theory of the defense. I would hold, as did the Court of Special Appeals, that it was error to exclude the evidence concerning the Battered Child Syndrome and to refuse to submit the issue of the reasonableness of respondent's perceptions, in light of factual foundation and the proffered expert testimony on the Battered Child Syndrome, to the jury.

The trial court excluded all the defense testimony related to Battered Child Syndrome on the ground that the defense analogy to Battered Spouse Syndrome, codified in Maryland Code (1973, 2002 Repl.Vol., 2003 Cum.Supp.) § 10–916 of the Courts & Judicial Proceedings Article, was inapposite. The trial court ruled that § 10–916 did not authorize, by analogy, the admission of evidence as to the Battered Child Syndrome. As the majority opinion eloquently sets out, the trial court was wrong on the law. It follows, then, that if the defense could produce *some* evidence as to the existence of the Battered Child Syndrome as it might bear on the reasonableness of respondent's perceptions at the time of the killing, in light of the factual evidence admitted and proffered, then respondent should have been permitted to present the defense to the jury.

The defense did present "some evidence" sufficient to create an issue before the jury of self-defense.

Defense counsel proffered to the court the summary of the testimony of Dr. Ellen McDaniel, a forensic psychiatrist, as follows:

"[S]he's going to give the opinion that [respondent] was a battered child, which is similar to the battered spouse. And that because of such and because of the type of social situation he was brought up with and some of his past experiences with Warren Smullen, that because of all this his psychological profile would be consistent with him honestly and reasonably believing that there was no way out, that he had no alternative than to do what he did on May 6th of the year 2000.

* * *

"[U]ltimately, Your Honor, [Dr. McDaniel] would be testifying to the contents of this report and ultimately her decision would be that he has similar traits that one would have to battered spouse. And a battered spouse sometimes perceives things differently than other people because of the continued beatings, so on and so forth. It's in here, if you want her to explain I will have her [do so] outside the presence of the jury.

"The long and short of it is Bruno Smullen has the same characteristics which may factor in his psychological profile, personality disorders. She would render an opinion that his psychological profile would be consistent with Bruno Smullen honestly believing that he had to use the level of force that he used because he reasonably thought that his life was in jeopardy and basically that there was no other way out.

"So it would be the analogy, to be honest with the Court, battered spouse, battered child, I was going to ask her that question."

In addition, respondent's statement to the police, admitted in its entirety before the jury through Deputy Diane Furbush, included information that respondent told her that on the

Tuesday evening before the killing, respondent and his father had argued about respondent's friend, Shawn. On prior occasions, respondent said, his father hit him and once, his father hit him in the chest so hard that it knocked the breath out of him. He said that he was abused physically quite a bit since his mother had died, and the beatings began after her death. Respondent said that his father had threatened to hurt him, but the threat of harm was not tied to that particular Saturday. Respondent said that his father told him that the only way he would leave the house again would be in a pine box. Respondent said that he believed this statement to mean that his father was going to kill him.

Deputy Rudell Brown testified that respondent told him that he had been arguing with his father since the previous Tuesday over his friendship with Shawn and that his father would not let him leave the house. Respondent said that on different occasions, his father punched him in the chest with a piece of wood and that the only way he would be leaving the house was in a pine box.

The factual basis of respondent's defense, supported by other witnesses, was set out in an offer of proof at trial, and was well stated by Judge Hollander, writing for the panel in the Court of Special Appeals. In a thoroughly researched opinion, the intermediate appellate court summarized the evidence the defense would have presented to the jury as follows:

"First, [respondent] called Willie Smullen, who described himself as Bruno's 'blood brother.' At the bench, [respondent] proffered that Willie resided in the Smullens' house with Bruno, and recalled 'three violent episodes in the house that Bruno witnessed.' One occurred when Warren broke furniture and 'slapped Anna Mae around in a fight.' Defense counsel continued: 'Another was when [Warren] pulled a gun on Miguel, Anna Mae got Miguel in the car and drove away.... The third one, Warren and Carlos were physically fighting, Carlos wanted to hang out with friends. Warren got his gun but did not fire it.' Defense counsel also represented: 'Willie would further testify that Bruno was present when Warren shook [Willie].' In addition,

'Willie would testify he left the house because of fear of Warren.... And that Warren drank alcohol to excess.'

* * *

"In addition, [respondent] attempted to introduce Anna Mae's medical records to corroborate the brothers' proffered testimony as to the cause of her injuries. Defense counsel also maintained that the records were relevant to establish [respondent's] 'perception' and 'psychological profile,' which were 'consistent with [respondent] having an honest but maybe unreasonable belief he had to do what he had to do to survive.' The court sustained the State's objection.

"The defense also proffered the testimony of Lori Batts, the vice principal of [respondent's] school. [Respondent's] attorney indicated that she would have testified that when [respondent] was suspended from school in January 1999, his 'reaction to the suspension was very severe. He specifically said "I can't go home, my dad is going to kill me, you don't understand.'" She also would have said that [respondent] was 'very upset and crying continuously saying he could not go home.'

"Further, the defense proffered the testimony of David Harner, Dean of Students at [respondent's] school. According to defense counsel, Harner would have said that he occasionally 'dropped Bruno off at home. At one point in time ... there was no one home and [respondent] said he was not allowed to enter the house.' In addition, Harner would have testified that he was aware that Warren 'was a strict disciplinarian' and 'Bruno was not allowed to hang out with his friends and not allowed to do stuff that [his] friends could do.' Moreover, when Bruno was suspended from school, he was 'emotionally upset to the point of having watery eyes,' and he 'was afraid that his father would find out.' Bruno also disclosed to Harner that 'his father could become violent at times....'

"Anthony Giddens, [respondent's] high school guidance counselor, testified that he knew [respondent] since he was

eight or nine years old, both as a neighbor and from church. In addition, Bruno worked for him on the weekends at his home, doing odd jobs. The State objected when Giddens was asked if he knew whether [respondent] 'had made any plans recent to May 6th to move out of the house.' At that point, the defense proffered that Giddens would say [respondent] was trying to 'escape' the house, but 'was not able to escape.' It was also Giddens's understanding that [respondent] 'was trying to live with the Harpers.' After the killing, [respondent] told Giddens that his father had said that one of them would leave in a body bag. [Respondent] said that he was afraid, but did not know who to tell.

"The defense attempted to call Harrison Bell, the victim's co-worker. Defense counsel proffered that Bell was present when Ashley and Erica informed Warren that Bruno was out with Shawn Williams, instead of at drill practice. According to the defense, Bell would have testified that 'Warren's response is I'm going to get him . . . To be exact, get up in his ass.' Bell would also say that he told Warren, 'You better watch, that little jigger bug might get your ass.'

"A proffer was also made as to Alonso White, another co-worker of the victim. Through him, the defense claimed it would show that Warren admitted 'that he consumed alcohol . . . and also beat Bruno.' In addition, White would testify that Warren 'warned Bruno not to say anything about it.'

"In addition, the defense proffered the testimony of Bernard White. He would have testified that, when Ashley and Erica told Warren that Bruno was out with Shawn, Warren responded 'that he was going to get [respondent's] ass when he got home. . . .'

"Hope Collins, [respondent's] friend, testified that in the weeks prior to May 2000, [respondent] 'was looking real depressed,' and having 'bad headaches.' Moreover, she claimed that he seemed 'spaced out.' The court sustained the State's objection when Collins was asked if she ever noticed any injuries to Bruno. Accordingly, [respondent] proffered that Collins would have said that she 'did see bruises' on [respondent's] 'forehead and elbows.' Bruno also told Collins 'that Warren would beat Bruno for things

Bruno didn't do.' Bruno also revealed to Collins that Warren was 'verbally abusive' to him, and that Warren said he 'was tired of looking at [respondent's] face.'

"[Respondent] also proffered the testimony of Chastity White. According to the defense, she would have testified that [respondent] told her that Warren had 'grabbed him by the collar' when Warren was 'in a drunken state.'

"Aundra Roberts, Administrative Assistant to the President of the University of Maryland, Eastern Shore, was called to testify for the defense. But, the court sustained the State's objection to her proposed testimony regarding [respondent's] depression and his close relationship with Anna Mae."

The majority concludes that, notwithstanding the applicability of the Battered Child Syndrome and the analogy to the Battered Spouse Syndrome, the proffered evidence had no relevance. The majority determines that, notwithstanding the plethora of proffered evidence of the repetitive cycle of violence and threats to kill respondent, "[n]o one ever saw Bruno being assaulted by Warren or exhibiting any injuries from such an assault." Maj. op. at 271. The short answer is "so what?" We have made clear that the source of the evidence is immaterial and the fact that it emanates from the defendant does not eviscerate the evidence. The majority refers to the proffered evidence as "hearsay." Maj. op. at 272. Respondent's confession was admitted without redaction or limitation. The other evidence which was excluded was excluded not on the basis of hearsay but rather of relevancy.

Throughout the majority opinion is an undercurrent that corroboration is required. Corroboration has *never* been required. So why does the majority's comment that "[n]o one ever saw Bruno being assaulted by Warren or exhibiting any injuries from such an assault," have anything to do with the issue before the Court—whether Bruno has presented *some* evidence bearing on the defense? *See, e.g.,* "The only evidence that even remotely might corroborate an assault would have come from Ms. Collins, who apparently saw Bruno at some undefined point with some bruises on his forehead and

elbow—bruises that were in no way linked to any assaultive conduct on Warren's part." Maj. op. at 272.

The majority rejects the evidence as irrelevant because the only evidence regarding the assaults came from hearsay statements made by respondent or Warren except for the incident when Warren hit respondent in the chest with a piece of wood. What about the threat that respondent would only leave the house in a pine box? And respondent's statements that he believed that Warren would kill him?

The majority looks to *State v. Marr*, 362 Md. 467, 765 A.2d 645 (2001) as the foundation for the required analysis. Maj. op. at 270. The Court of Special Appeals seemed to agree, and noted that although *Marr* did not involve a battered person, "it tends to support the conclusion that, at the very least, [respondent] was entitled to present evidence relevant to his state of mind." The intermediate appellate court continued:

"In elucidating the subjective component of imperfect self-defense and the element of state of mind, the *Marr* Court noted that the defendant's belief as to imminent danger or the extent of force is 'founded upon the defendant's sensory and ideational perception of the situation that he or she confronts....' *Id.* at 481; 765 A.2d 645. That perception, said the Court, is *'often shaded by knowledge ... of ancillary or antecedent events.' Id.* (emphasis added). Surely, a child's history of abuse, inflicted by a parent, qualifies as an 'antecedent event' that might well 'shade' the child's perception of reality. Moreover, even if the child's 'perception is incorrect,' the Court observed in *Marr* that an error of this kind would 'not necessarily make it unreasonable.' *Id.* To the contrary, the Court recognized that 'human beings often misunderstand their surroundings and the intentions of other people.' *Id.* In those situations, according to the Court, 'the jury would have to determine the reasonableness of the defendant's conduct in light of his reasonable, though erroneous, perception.' "

To be sure, testimony that respondent suffers from the Battered Child Syndrome, standing alone, does not ensure

that his belief in imminent harm was reasonable and does not eliminate respondent's need to present *some* evidence that his belief in imminent danger was reasonable at the time of the killing. But respondent made an offer of proof to support the necessary foundation. Other courts around the country have recognized that simply because "the triggering behavior and the abusive episode are divided by time does not necessarily negate the reasonableness of the defendant's perception of imminent harm. Even an otherwise innocuous comment which occurred days before the homicide could be highly relevant when the evidence shows that such a comment inevitably signaled the beginning of an abusive episode." *State v. Janes,* 121 Wash.2d 220, 850 P.2d 495, 506 (1993). *Marr* also supports this view.

As the Court of Special Appeals correctly noted, the burden of producing "some" evidence is not an onerous one. In reality, it is a very modest level of proof. The trial court abused its discretion in excluding the testimony of the expert witness and in refusing to instruct on the defense of self-defense. Petitioner met the standard and should have been permitted to present his defense to the jury.

Chief Judge BELL and Judge ELDRIDGE authorize me to state that they join in this dissenting opinion.