*Thomas Dwayne Cook v. State of Maryland*, No. 14, September Term, 2023.  Opinion by Eaves, J.

**MD. CODE ANN., CRIMINAL PROCEDURE ARTICLE § 8-201 – POST-CONVICTION DNA TESTING – EXCULPATORY OR MITIGATING EVIDENCE**

Section 8-201(d)(1) of the Criminal Procedure Article of the Maryland Code provides that a person convicted of a crime of violence is entitled to post-conviction DNA testing if "a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing[]" and "the requested DNA test employs a method of testing generally accepted within the relevant scientific community."  Appellant claimed that DNA testing had a reasonable probability of producing evidence tending to show that he engaged in self-defense and that the victim's injuries lacked the requisite severity to sustain his conviction. The Supreme Court of Maryland held that there was not a reasonable probability that DNA testing of the evidence requested had the scientific potential to produce exculpatory or mitigating evidence.  As such, the circuit court properly denied Appellant's petition for post-conviction DNA testing without a hearing.

IN THE SUPREME COURT

OF MARYLAND

No. 14

September Term, 2023

_____

THOMAS DWAYNE COOK

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Hotten, Michelle D., (Senior
    Justice, Specially Assigned),

JJ.

_____

Opinion by Eaves, J.

_____

Filed: August 20, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

# I
# INTRODUCTION

Section 8-201 of the Criminal Procedure Article ("CP") of the Maryland Annotated Code (1957, 2018 Repl. Vol.) (the "DNA Testing Statute") allows individuals convicted of certain crimes to petition for DNA testing of certain evidence.[1] Under this statute, an individual is entitled to that DNA testing if a circuit court finds that two criteria have been met: (1) "a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing[]" and (2) "the requested DNA test employs a method of testing generally accepted within the relevant scientific community."[2]

This case is a direct appeal from an order of the Circuit Court for Somerset County, denying a request for DNA testing.[3] Thomas Dwayne Cook, Appellant, was convicted of several crimes, including the first-degree assault of Lieutenant Aubrey Fletcher, while Appellant was serving a prison sentence for a prior, unrelated crime at Eastern Correctional Institution ("ECI") in Westover, Maryland. Appellant appeals an October 19, 2023, order

---

[1] CP § 8-201(b)(1).

[2] *Id.* § 8-201(d)(1)(i)–(ii).

[3] The DNA Testing Statute provides for a direct appeal from the circuit court to this Court. *Id.* § 8-201(k)(6) ("An appeal to the [Supreme Court of Maryland] may be taken from an order entered under this section."). The General Assembly enacted the DNA Testing Statute in 2001, *see* 2001 Md. Laws, ch. 418, but an individual's direct right of appeal did not arise until two years later, *see* 2003 Md. Laws, ch. 240. While the original appellate right was limited only to orders issued pursuant to certain subsections at that time, a direct appeal to this Court—as the right exists today—may be taken from any order entered under CP § 8-201.

of the circuit court that denied, without a hearing, his July 2023 Petition for DNA Testing (the "Petition"), in which he seeks DNA testing of the shirt he wore at the time of the assault against Lt. Fletcher. For the reasons that follow, we affirm the judgment of the circuit court.

**II**
**BACKGROUND**

*A.*     *Factual Background*

The pertinent facts underlying Appellant's convictions come from the trial testimony of correctional staff, Appellant, and other inmates at ECI.

On the morning of October 30, 2004, Appellant started his work assignment as the housing tier's laundryman. While doing his rounds, Correctional Officer ("CO") Thomas Cook (unrelated to Appellant) and Appellant became involved in an argument. CO Cook believed that, at some point in the argument, Appellant called him an expletive. Accordingly, CO Cook informed his supervisor, Lt. Fletcher, about the infraction. Looking to question Appellant about the argument, Lt. Fletcher found and ordered Appellant to follow him to a part of the housing unit where other inmates would not hear the conversation. The testimony paints markedly different versions of what happened next.

The correctional staff's version is as follows. Lt. Fletcher claimed that, once in a more private area, he asked Appellant about the argument with CO Cook and whether Appellant used profanity. Lt. Fletcher described Appellant as "belligerent"—flailing his arms while declaring that he did not have to listen to the lieutenant. In response, Lt. Fletcher fired Appellant from his work assignment and instructed Appellant to return to his

2

cell and "lock in" by shutting the door behind himself. Appellant did not comply and instead walked away to converse with other inmates.

Lt. Fletcher approached Appellant, whose back was facing Lt. Fletcher, and reiterated that Appellant needed to lock in. At this point, CO Cynthia Powell, who was on duty in the housing unit, witnessed Appellant turn around and say, "I'm not going to have anyone disrespect me, you're treating me like a child[,]" and "with a clenched fist . . . hit [Lt. Fletcher.]" Lt. Fletcher recounted that Appellant "started beating [him] in [his] head and face area." Another inmate joined Appellant, kicking Lt. Fletcher in the same area. Lt. Fletcher recalled that he received six to eight blows before blacking out. He also asserted that he never touched Appellant during their encounter. CO Vanessa Jones, the second officer in charge of the housing unit, did not witness Appellant's initial punch but observed Appellant and the second inmate assaulting Lt. Fletcher. CO Powell used a can of mace against the inmates assaulting Lt. Fletcher, but they continued their attack. The assault only concluded after CO Powell retreated to CO Jones's station to retrieve another can of mace. By the time CO Powell returned to Lt. Fletcher, Appellant and the other inmate had fled from the area where the assault took place.

Appellant recalled the events differently. He described how Lt. Fletcher raised his voice while pointing his finger in Appellant's face. After telling Lt. Fletcher that he did not curse at CO Cook, the conversation ended, and Appellant proceeded to grab his laundry. Appellant then explained that he started conversing with another inmate just as Lt. Fletcher came from behind and grabbed his arm. Aware that it was Lt. Fletcher, but

3

worried that he was going to be assaulted,[4] Appellant "instinct[ually] . . . turned around and . . . struck [Lt. Fletcher]."[5] According to Appellant, he and Lt. Fletcher then exchanged three or four punches each. Appellant believed that, during the altercation, Lt. Fletcher struck Appellant in the "lower eye"[6] with a "big ring" that Lt. Fletcher was wearing. The fight concluded, according to Appellant, after CO Powell deployed a can of mace, causing Appellant to retreat to the tier's dayroom to wash his face. Another CO eventually detained Appellant.

COs Powell and Jones described Lt. Fletcher's physical condition in the aftermath of the assault. CO Powell saw Lt. Fletcher crouched in the corner of the room fading in and out of consciousness as blood poured from his face. CO Jones observed Lt. Fletcher slumped over and unable to move. CO Jones saw medical staff place Lt. Fletcher's neck in a brace and take him by stretcher for medical treatment. At the local hospital where Lt. Fletcher was taken by ambulance, one of Lt. Fletcher's neurologists determined that Lt. Fletcher suffered a concussion. The neurologist expressed that Lt. Fletcher deserved "appropriate attention and evaluation in the emergency room" because there was "certainly reason to believe there was a potential of serious injury[,] meaning . . . potentially

---

[4] Given "the way [Lt. Fletcher] grabbed [him,]" Appellant feared that Lt. Fletcher was going to "assault [him]."

[5] Two other inmates called to testify at trial similarly recounted that Lt. Fletcher grabbed Appellant's arm, who responded by spinning around and striking Lt. Fletcher. However, desiring to stay out of the fray, the two inmates quickly left the area without witnessing the rest of the altercation.

[6] The record does not indicate in which eye Appellant claims that Lt. Fletcher struck him.

4

intercranial bleeding[.]"  As a result of the assault, Lt. Fletcher suffered hearing loss, tinnitus, dizziness, blurry vision, headaches, loss of balance, neck and back pain, depression as a result of post-traumatic stress disorder, and short-term memory loss.  These injuries caused Lt. Fletcher to retire early.

## B.     *Procedural Background*

In addition to the testimony recounted above, we highlight several components of Appellant's criminal trial relevant to this appeal.  Notably, the State introduced into evidence the shirt and shorts that Appellant wore during the altercation with Lt. Fletcher.  On the shirt are several circular-shaped stains in a line across what would be the stomach area.  The State also introduced a picture of Appellant taken during the subsequent investigation, which depicts Appellant wearing the same shirt bearing the stains just described.

At the close of the evidence, the circuit court instructed the jury on the law of perfect self-defense, which we discuss further below.  The jury was also instructed on the law of first-degree assault, with the circuit court saying that the "State must prove all of the elements of second[-]degree assault . . . and must also prove[] . . . that the defendant . . . intended to cause serious physical injury in the commission of the assault."  The circuit court then defined serious physical injury for the jury as one that either "creates a substantial risk of death or[] . . . causes serious and permanent or serious and protracted disfigurement or loss of impairment of the function of any bodily member or organ."

In closing arguments, the State told the jury that "the most important part" of the instructions was the portion that a "defendant [must have] intended to cause serious

5

physical injury[]" to be convicted of first-degree assault. That instruction was most important, the State argued, because pictures of Lt. Fletcher that were also introduced into evidence demonstrated Appellant's intent to cause serious physical harm. Further, during its rebuttal argument, the State argued to the jury that the pictures depict "blood splatter all over [Appellant]," and that the only source of that blood could be Lt. Fletcher. This, the State pressed, had to be so because, despite Appellant's testimony to the contrary, the picture of Appellant did not depict any injury to his eye.

The jury convicted Appellant of first-degree assault and reckless endangerment for the attack on Lt. Fletcher. The circuit court merged Appellant's convictions and sentenced Appellant to 25 years' imprisonment to be served consecutively to the life-sentence he already was serving.[7]

On appeal, Appellant challenged the sufficiency of the evidence for his convictions. As to his first-degree assault conviction, he argued that "the jury could not have found [that] he possessed the requisite intent to cause serious physical injury," because he did not use a weapon and because Lt. Fletcher was not a "vulnerable person." *Cook v. State*, No. 2930, Sept. Term, 2007, slip op. at 9–10 (Md. Ct. Spec. App. July 24, 2009). While the Appellate Court recognized that it was unclear how many of Lt. Fletcher's injuries were attributable to Appellant, as opposed to the other inmate who attacked Lt. Fletcher, it held

---

[7] Appellant also was tried on charges of second-degree assault and reckless endangerment against CO Powell. The jury could not reach a unanimous verdict for the former, but it did convict him of the latter. The circuit court sentenced Appellant to five years' incarceration for the reckless endangerment of CO Powell, to be served consecutively to the sentence for the crimes against Lt. Fletcher.

that the jury "could reasonably conclude that [A]ppellant, who was the first inmate to attack [Lt.] Fletcher, was intentionally attempting to inflict serious physical injury by his repeated blows to [Lt.] Fletcher's head." *Id.* at 10. Appellant sought review in this Court, but we declined to issue a writ of certiorari. *Cook v. State*, 411 Md. 600 (2009).

On July 31, 2023, Appellant filed the instant Petition, seeking DNA testing of the substance on the shirt he wore during the time he assaulted Lt. Fletcher.[8] In the Petition, Appellant alleges that the State misrepresented to the jury that the blood spatter was Lt. Fletcher's blood. The Petition then concludes that DNA testing will identify the stain's source, and, therefore has a reasonable probability of being exculpatory or mitigating. In its Answer, the State argued that Appellant simply failed to provide any "explanation as to what reasonable probability exists that this testing would produce exculpatory or mitigating evidence." On October 19, 2023, the circuit court, having received no reply from Appellant, issued its Order denying the Petition without a hearing.[9] The court stated:

> A clear review of the evidence and testimony from the trial of [Appellant] reflects overwhelming and persuasive evidence that [Appellant] assaulted Lt. Aubrey Fletcher and . . . that the assault on Lt. Fletcher was of such a heinous and vicious nature so as to constitute finding, beyond reasonable doubt, by a duly sworn and empaneled jury in the Circuit Court for Somerset County of first[-]degree assault.

---

[8] Appellant previously filed for post-conviction relief under the Uniform Postconviction Procedure Act, CP § 7-101, *et seq.*, but he was unsuccessful in obtaining any relief via that avenue.

[9] The circuit court previously denied the Petition in August 2023 via a one-sentence order. This Court remanded the matter back to the circuit court to issue an order compliant with Maryland Rule 4-709(e), explaining why the Petition should be denied without a hearing. The circuit court then issued the order currently on appeal.

The court, thus, was "not persuaded . . . that DNA testing in [Appellant's] case ha[d] the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing and, therefore, that the Petition . . . should be denied without a hearing." Appellant then noted an appeal to the Appellate Court of Maryland, which was transferred to this Court.

## III
## STANDARD OF REVIEW

"This Court 'reviews without deference the legal standard that a [circuit] court uses in ruling on a petition[]' for post-conviction DNA testing." *Satterfield v. State*, 483 Md. 452, 463 (2023) (alterations in original) (quoting *Fuster v. State*, 437 Md. 653, 671 (2014)). The issue presented in this case is whether the circuit court erred in denying the Petition without a hearing. Under Maryland Rule 4-709(b)(1)(B), "the court shall deny the petition . . . as a matter of law," where the "facts alleged in the petition . . . do not entitle the petitioner to relief" under the DNA Testing Statute. This Court reviews questions of law *de novo*. *See Satterfield*, 483 Md. at 466 (holding that, "as a matter of law, the facts alleged do not afford Petitioner relief[]").

## IV
## ANALYSIS

We first provide an overview of the relevant law before we address the parties' arguments and our resolution of those arguments.

### A.    *The DNA Testing Statute, Associated Rules, and Relevant Caselaw*

Because Appellant seeks relief through DNA testing, we first review the pertinent provisions of CP § 8-201, the associated Maryland Rules, and relevant precedent from this

8

Court. The DNA Testing Statute authorizes an individual, who has been convicted of a crime of violence, pursuant to § 14-101 of the Criminal Law Article ("CR") (1957, 2021 Repl. Vol.),[10] to petition for DNA testing of "scientific identification evidence" that (1) the State possesses and (2) is related to the judgment of conviction. "Scientific identification evidence" is any evidence that:

> (i) is related to an investigation or prosecution that resulted in a judgment of conviction;
>
> (ii) is in the actual or constructive possession of a law enforcement agency or agent of a law enforcement agency; and
>
> (iii) contains biological evidence from which DNA may be recovered that may produce exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing.

CP § 8-201(a)(5). A court must order DNA testing if the court finds that:

> (i) a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing; and
>
> (ii) the requested DNA test employs a method of testing generally accepted within the relevant scientific community.

*Id.* § 8- 201(d)(1)(i)–(ii).

Under subsection (d), a "reasonable probability" is a "fair likelihood that something is true[,]" *Givens*, 459 Md. 694, 707 (2018) (citing *Beaman v. State*, 453 Md. 407, 420

---

[10] When discussing the DNA Testing Statute, we have often referred to the requirement that an individual be convicted of a necessary predicate offense before being able to file a petition as "standing." *See Simms v. State*, 409 Md. 722, 725 n.3 (2009) ("Appellant, as a person convicted of first[-]degree murder, has standing to file the petition."). Appellant meets the standing requirement because of his conviction for first-degree assault. *See* CR § 14-101(21).

(2017)); it does not mean that an individual must establish "that the result would have been different if the DNA results sought were known at the time of trial[,]" *id.* (quoting *Edwards v. State*, 453 Md. 174, 196 (2017)).  Nor does an individual who seeks DNA testing need to prove that the results would exonerate the individual.  *Edwards*, 453 Md. at 191 ("Nothing in the plain language of the statute suggests that the testing results must 'exonerate' a petitioner or 'prove' that someone else committed the crime.").  Rather, the evidence need only "tend to clear the accused of guilt, or tend to establish [the accused's] innocence."  *Givens*, 459 Md. at 708 (emphases omitted) (quoting *Edwards*, 453 Md. at 196).  We move next to the procedural requirements outlined in CP § 8-201's accompanying rules.

Maryland Rule 4-704(a) governs the content of an individual's petition.  As relevant here, a petition has three requirements.  First, the petition must include a description of the specific scientific identification evidence that an individual seeks to test.  Md. Rule 4-704(a)(2)(A).  Second, the petition must state a factual basis establishing that (1) the State either possesses that evidence or can acquire it, (2) the evidence relates to the conviction, and (3) a reasonable probability exists that the testing has the scientific potential to produce exculpatory or mitigating evidence relevant to the wrongful conviction or sentencing claim.  *Id.* 4-704(a)(2)(B).  Third, "to the extent known[,]" the petitioner must describe the type of DNA testing they wish to employ and explain that method's general acceptance within the relevant scientific community.  *Id.* 4-704(a)(2)(C).

Upon receiving notice of the filing of a petition, the State is required to file an answer within 60 days, unless the time to answer has been extended by the court.  *Id.* 4-

10

706(a), (c)(1). A petitioner may then respond to the State no later than 60 days after receipt of the answer, *id.* 4-708; however, "[u]pon consideration of the State's answer, the court may deny the petition if it finds as a matter of law that (1) the petitioner has no standing or (2) the facts alleged in the petition do not entitle the petitioner to relief[,]" *id.* 4-707(a). As we recently have held, the court's discretion to deny the petition under Rule 4-707(a) does not require that it wait to receive a petitioner's response or for the window in which the petitioner may file a response to close. *Satterfield*, 483 Md. at 481 ("Rule 4-707(a) neither requires the circuit court to await or consider [a p]etitioner's response nor entitles [a p]etitioner to a response.").

As relevant to this case, a court must hold a hearing if it finds that a petitioner has standing, the identified "scientific identification evidence" exists and is related to a judgment of conviction, there is a method of DNA testing that may exist and is "generally accepted within the relevant scientific community," and "there is or may be a reasonable probability that [DNA] testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing[.]" Md. Rule 4-709(a)(1). However, the court must deny the petition without a hearing if the petitioner has no standing or, as a matter of law, the facts alleged in the petition, as required by Rule 4-704, do not entitle the petitioner to relief under CP § 8-201. *Id.* 4-709(b)(1). "If the court declines to hold a hearing, it shall enter a written order stating the reasons why no hearing is required." *Id.* 4-709(e). Where a hearing is not required by the Rules, a reviewing court nevertheless has the discretion to hold a hearing on the petition. *Id.* 4-709(c).

11

## B.    *The Petition's Facial Sufficiency*

At the outset, the State contends that the Petition fails to comply with CP § 8-201 and Rule 4-709 in that the Petition "does not so much as hint" at how testing has the scientific potential to produce exculpatory or mitigating evidence. The State argues that the Petition "provided no *factual basis* for [Appellant's] bare assertion that DNA testing had a reasonable probability of producing exculpatory or mitigating evidence." (Emphasis added). The State also highlights how Appellant asked the circuit court for permission to reply to the State so he could explain how DNA testing would have a reasonable probability of producing exculpatory or mitigating evidence. This, the State believes, "is exactly the *factual basis* that [Appellant] was required to include in [the P]etition[]" and believes that Appellant's request concedes the Petition's facial inadequacy, requiring that it be denied without a hearing. (Emphasis added).

The State does not cite to Rule 4-704(a)(2)(B) in making these assertions. But, the requirement that a petition contain "statement[s] of the factual bas[e]s" for certain claims comes *directly* from that Rule. *See* Md. Rule 4-704(a)(2)(B) ("The petition shall contain: . . .a statement of the *factual basis* for the claims that . . . .") (emphasis added)). Naturally, then, the State's allegation that the Petition contained "no factual basis" for one of the three required claims is an argument that the Petition did not conform to the pleading requirements in Rule 4-704(a)(2)(B).[11]

_____

[11] Our interpretation of the State's argument is further confirmed by the State's position during oral argument. There, the State reiterated that it believed the Petition was "legally insufficient" because it contained only three facts: (1) the introduction of the picture showing Appellant in his stained shirt, (2) the shirt contained a blood-like substance

12

We recognize that Appellant petitioned the circuit court *pro se* and that we liberally construe such pleadings, *Simms*, 409 Md. at 731 (citing *Hughes v. Rowe*, 449 U.S. 5, 10 n.7 (1980)), especially in the case of remedial laws like the DNA Testing Statute, *id.* at 731–32. Applying a liberal construction, the Petition meets the pleading requirements of Rule 4-704. The Petition asserts that Appellant "seeks to have tested [the] clothing that's under the State's control purportedly with the victim's blood on them." It also alleges that, during the criminal trial, the State presented evidence of a "blood[-]like substance" on the Appellant's clothes from the incident, which "[t]he State misrepresented . . . by indicating that [Appellant's] clothing was covered in blood." The Petition also asserts that the State told the jury that there was only one place "this blood" could have come from—the victim, Lt. Fletcher. Finally, Appellant's Petition concludes by stating that there "is a reasonable probability that the DNA testing will produce exculpatory or mitigating evidence" by "identify[ing] the source of . . . the blood splatter that's on [Appellant's]clothing."

Appellant, thus, identified the scientific evidence to be tested as the blood or other substance on his clothing, alleged that the clothing is in the State's control, and explained how the State used the evidence at trial. These assertions satisfied Maryland Rules 4-704(a)(2)(A)–(a)(2)(B)(ii). This leaves us to discern whether Appellant's assertion that the

---

on it, and (3) the State's suggestion to the jury that the blood came from Lt. Fletcher. From that, the State believes that it was "not reasonable" that the circuit court could come up with the "novel theory" that Appellant advances, *i.e.*, that the blood stain came from Lt. Fletcher and, therefore, supports Appellant's claim of self-defense. Thus, the State believes that the Petition "did not allege *facts* on which a court could find in his favor." (Emphasis added). Again, we interpret the State to be arguing that the Petition did not contain the requisite "factual basis" as required by Rule 4-704(a)(2)(B).

State misrepresented the stains as Lt. Fletcher's blood, and his contention that DNA testing would determine the stains' source satisfies Rule 4-704(a)(2)(B)(iii)'s requirement to plead the existence of a reasonable probability that testing the stain has the scientific potential to produce relevant exculpatory or mitigating evidence.

While Appellant's formulation perhaps is not the most fine-tuned, applying the liberal construction appropriate to his *pro se* pleading, we hold that it is sufficient. The Petition reflects Appellant's theory that the State improperly argued to the jury that Appellant's shirt, which was introduced into evidence, contained Lt. Fletcher's blood. *Cf. Douglas v. State*, 423 Md. 156, 184 (2011) (holding that, while the defendant's *pro se* petition for a writ of actual innocence explicitly did not ask for a hearing, the petition nevertheless "indicated [the defendant's] desire" for one and "recited" pertinent provisions of the statute at issue). Given that Appellant's theory of the case at trial was self-defense, and the State introduced the picture of Appellant and the clothing in support of its first-degree assault charge, the logical reading of the Petition is that Appellant believes the testing of the stains could support his self-defense claim by demonstrating that the blood is his, and not Lt. Fletcher's. Appellant's Petition, thus, satisfied the requirement that he plead the existence of a reasonable probability that testing has the scientific potential to produce exculpatory or mitigating evidence.[12] Thus, a liberal review of the Petition shows

---

[12] At this stage, we do not evaluate the merits of the statement, just whether Appellant complied with the pleading requirements of Rule 4-704(a)(2)(B).

that it complies with the requirements set out in Maryland Rule 4-704.[13]  We now turn to the merits.

## C.  *Appellant's Substantive Claims*

### 1. Appellant's entitlement to relief under CP § 8-201

Appellant believes that a proper analysis of the evidence he seeks to have tested will reveal that he is at least entitled to a hearing in the circuit court about his right to testing. He claims that his initial *pro se* pleading makes a *prima facie* showing that, for two reasons, there is a reasonable probability that DNA testing has the scientific potential to produce exculpatory or mitigating evidence.  First, Appellant argues that testimony about a mutual exchange of blows lends credence to the possibility that the stain on the clothing is his blood, contrary to the State's claim that it was Lt. Fletcher's blood.  If DNA testing of the stain confirms that it is Appellant's blood, then Appellant claims it would corroborate his account of a mutual exchange of blows and that his resulting injury was incurred while acting in self-defense.  Accordingly, Appellant avers that because complete self-defense acquits a defendant of all charges, an outcome where the stain was Appellant's blood would tend to be exculpatory or mitigating.

---

[13] While a petition for DNA testing also must provide a description of the DNA testing sought and that testing's general acceptance within the relevant scientific community, we are mindful that such information is required, "to the extent known[.]" Md. Rule 4-704(a)(2)(C).  The Petition does not request or mention any specific form of DNA testing.  We assume that Appellant is not requesting anything beyond routine DNA testing used to determine whether the stain is in fact blood and, if so, whose blood.  Therefore, Rule 4-704(a)(2)(C) poses no impediment to the Petition's adequacy.

15

Second, Appellant contends that "the State argued that the untested substance was [Lt.] Fletcher's blood and therefore demonstrative of [Lt.] Fletcher's serious physical injury." So, Appellant claims, if the stains are either Appellant's blood or something other than blood, either outcome "tend[s] to negate" the serious bodily injury that the State claimed Lt. Fletcher suffered, mitigating Appellant's guilt.

For its part, the State puts forth two reasons that we should affirm the circuit court. First, the State contends that there is not "a fair likelihood" that testing has the scientific potential to produce exculpatory or mitigating evidence. The State maintains that the circuit court's analysis is not an example of "clear error" because the record is clear that the stains are not Appellant's blood. The State relies on the absence of any evidence offered at trial tying Appellant's injuries, if he suffered any, to the stains and on evidence that the only medical attention Appellant sought was to wash the mace out of his eyes, which he also suggested at trial was the source of the stain. In support, the State points out that the photo of Appellant taken after the incident demonstrates an absence of any cuts or blood, and that Appellant, in his closing argument, implies that he was uninjured. This, the State contends, stands in contrast to the testimony that described Lt. Fletcher's extensive bleeding and other injuries.

Second, and more directly challenging testing of the stain, the State contends that under Appellant's version of events, DNA testing would not advance his self-defense claim. It notes that Appellant's own testimony was that he responded to a grab of the arm by punching Lt. Fletcher in the face. To the State, that use of force was unreasonable in the context of "an exceedingly minor provocation." Although Appellant claims that a prior

16

history of assault by Lt. Fletcher made him fear the same would occur on this occasion, Appellant's fear here was not reasonable given that Lt. Fletcher only "grabbed" or "pulled on" Appellant's arm. As a result, the self-defense claim "would necessarily fail regardless of the nature or source of the substance on" Appellant's clothing.

As to the severity of Lt. Fletcher's injuries, the State contends that Appellant's position is likewise unavailing because of the overwhelming evidence of the nature of Lt. Fletcher's injuries. Relying on the "attempt" prong of first-degree assault, the State argues that the testimony that Appellant repeatedly punched Lt. Fletcher in the face demonstrates an attempt to cause serious physical injury.

Evaluating these arguments in light of the record below, we hold that the circuit court did not err in denying Appellant's Petition. Appellant did not satisfy his burden to identify that there may be a reasonable probability that DNA testing has the scientific potential to produce exculpatory or mitigating evidence and, therefore, he is not entitled to a hearing on his Petition.

A petitioner for DNA testing must show that, "*more than* [*a*] *mere possibility*," there is a "*fair likelihood*" that testing would produce exculpatory or mitigating evidence. *Satterfield*, 483 Md. at 467 (quoting *Givens*, 459 Md. at 707). Appellant must "demonstrate that the testing he seeks has the scientific potential to produce evidence that would tend to show that he did not commit the crime, or that he is innocent." *Givens*, 459 Md. at 708. The crime of first-degree assault, CR § 3-202, for purposes of this case, prohibits a person

17

from intentionally causing or attempting to cause serious physical injury to another.[14]  In other words, Appellant must show that testing the stain on his shirt *would tend to show* that he did not commit first-degree assault.  *See Givens*, 459 Md. at 708; *Satterfield*, 483 Md. at 467 ("Petitioner must demonstrate that there is a reasonable probability that the testing of the cigarette butt 'has the scientific potential' to produce exculpatory or mitigating evidence 'that would tend to show that he did not commit the crime[.]'" (alteration in original) (citation omitted)).  We do not find that to be true here.

By his own admission, Appellant struck Lt. Fletcher multiple times.  Because Appellant believes his conduct was justified and, in the alternative, contests the severity thereof, we will "examine the facts of the crime, . . . the petitioner's assertions[,]" as well as the evidence the jury heard regarding Appellant's stained shirt.  *Givens*, 459 Md. at 714 (citations omitted).[15]

---

[14] The crime of first-degree assault has remained unchanged since the time of Appellant's original conviction.  *See* CR § 3-202 (2002) (prohibiting one from "intentionally causing or attempting to cause serious physical injury to another").

[15] In previous opinions, we have identified multiple factors, in addition to the ones noted above, for courts to consider when determining whether DNA testing has the potential to mitigate conduct or exculpate the petitioner.  If relevant, a court may also assess (1) the nature of the item (e.g., whether it is an instrumentality of the crime), (2) the physical proximity between where the item was located and where the crime occurred, (3) the temporal proximity between when the perpetrator touched the item and when the crime occurred, (4) the temporal proximity between the crime and the discovery of the item, and (5) the condition of the item. *Edwards*, 453 Md. at 199 (discussing factors (1)–(3)); *Givens*, 459 Md. at 714 (discussing factors (4)–(5)).  Because these factors are aimed primarily at determining *who* committed a crime, they are inapplicable in this case. *See Satterfield*, 483 Md. at 464 ("[The petitioner] believes that the DNA testing could 'implicate' . . . [two other persons] before the jury."); *Givens*, 459 Md. at 702 ("[The petitioner] denied that he killed [victim].");  *Beaman*, 453 Md. at 411 ("Defense counsel explained to the jury during closing

Recall that Appellant's theory of the case was that he punched Lt. Fletcher in self-defense. Appellant now contends that a DNA test showing that the blood on his clothing was his own would be exculpatory because it would support his self-defense claim. As its name suggests, perfect self-defense is a total defense to murder—and all lesser included offenses *including first-degree assault*—and, "if credited by the trier of fact, results in an acquittal." *Porter v. State*, 455 Md. 220, 235 (2017) (quoting *State v. Smullen*, 380 Md. 233, 251 (2004)). Perfect self-defense requires a showing of the following:

> (1) The accused must have had reasonable grounds to believe himself in *apparent* imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

---

arguments [the petitioner's] theory of misidentification[.]"); *Edwards*, 453 Md. at 182 ("[The petitioner] denied having any contact with [victim] on the night in question.").

Appellant, however, argues that the circuit court's Order had to rely on these factors and that the failure to do so was an error. We reiterate, however, that using these factors is not a requirement. A circuit court may consider none, some, or all of the factors, depending on whether they are relevant in a particular case, and, as discussed, here they are not. *See Edwards*, 453 Md. at 199 ("[A] court *may* take into account factors such as . . . ." (emphasis added)); *Givens*, 459 Md. at 714 ("We consider that *some* of the factors set forth in *Edwards* are relevant here[.]" (emphasis added)).

*Id.* at 234–35 (quoting *Smullen*, 380 Md. at 252). Thus, Appellant must demonstrate that DNA testing of his clothing has a reasonable probability of producing evidence that tends to show he acted in self-defense. *See Givens*, 459 Md. at 708; *Satterfield*, 483 Md. at 467.[16]

But using DNA testing to determine the source of the "blood-like" stains is irrelevant to the merits of Appellant's perfect self-defense claim. An analysis of perfect self-defense requires ascertaining the defendant's subjective beliefs at the time of the confrontation, and then determining whether, objectively, those beliefs were reasonable. *Porter*, 455 Md. at 235. Perfect self-defense in Maryland requires "that the defendant's belief of imminent death or serious bodily harm and the need to respond with the amount of force used 'coincide with that which would have been entertained under the same circumstances by a person of average prudence.'" *State v. Marr*, 362 Md. 467, 480 (2001) (quoting *Guerriero v. State*, 213 Md. 545, 549 (1957)). Whether a "reasonable person" would be in fear and reach the same conclusions as a defendant, *i.e.*, that using force is necessary, is a fact-specific inquiry examining the circumstances as they existed in the moments before the defendant used force. *See Smullen*, 380 Md. at 270 ("[I]f the defendant is confronted by a person with a gun, he may reasonably, even if incorrectly, believe that the gun is loaded and presents an imminent danger and shoot the person in self-defense."); *Marr*, 362 Md. at 480 ("In making that determination, the facts or

---

[16] In *Jones v. State*, we stated that if a defendant successfully argues perfect self-defense, then that individual is "legally *exonerated* from the criminal liability his or her actions may create[.]" 357 Md. 408, 425 (2000) (emphasis added). As we have discussed above, exoneration is narrower than exculpation. *See Givens*, 459 Md. at 707–08. It stands to reason then that if DNA testing has a reasonable probability of exonerating Appellant, such testing automatically will have a reasonable probability of exculpating him.

circumstances *must* be taken as perceived by the defendant, even if they were not the true facts or circumstances, *so long as a reasonable person in the defendant's position could also reasonably perceive the facts or circumstances in that way*."); *State v. Martin*, 329 Md. 351, 365 (1993) ("Since it is the defendant's subjective belief at the moment that the fatal shot is fired that is relevant and probative, evidence of a prior mental state will not suffice.").

Appellant testified that it was his "instinct[]" to punch Lt. Fletcher because the lieutenant grabbed his arm while he was trying to walk away. Appellant also testified about two previous confrontations with Lt. Fletcher one year to 18 months before the events of this case. On those two occasions, Appellant stated that Lt. Fletcher "would go out of his way just to say little things just to irritate [Appellant]." Appellant further testified that when Lt. Fletcher confronted him about calling CO Cook a profane name with Lt. Fletcher "st[i]ck[ing] his finger in [Appellant's] face," Appellant stated: "he's not going to treat me like a child."

Even under Appellant's version of the facts, self-defense, as articulated in *Porter*, is legally unavailable to Appellant. First, there are no grounds, reasonable or otherwise, to believe that Appellant was in *apparent* imminent or immediate danger of death or serious bodily harm from Lt. Fletcher. *See Porter*, 455 Md. at 234–35. In his previous "confrontations" with Lt. Fletcher, Appellant indicated that Lt. Fletcher only "used to say things to irritate [him]." Second, there are no facts to show that Appellant believed himself "in this [apparent imminent or immediate] danger [of death or serious bodily harm]." *Id.* at 235. A finger in his face hardly demonstrates apparent imminent or immediate danger,

21

serious bodily harm, or death. *See id.* Third, Appellant was the aggressor here. He knew that Lt. Fletcher had directed him to "lock in[,]" and, based on his previous interactions with Lt. Fletcher, Appellant had no reason to believe that the grabbing of his arm was the start of a physical confrontation. Additionally, Appellant's testimony that he was not going to allow Lt. Fletcher "to treat [him] like a child"—belie any supposed fear.[17] Finally, turning and punching Lt. Fletcher, first on "instinct[]" and then repeatedly, was unreasonable and excessive force. *Id.* at 235 ("The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.") (quoting *Smullen*, 380 Md. at 252)). Therefore, no reasonable person could take or perceive the facts or circumstances as perceived by Appellant as evidence of self-defense. *See Marr*, 362 Md. at 480 ("In making that determination, the facts or circumstances *must* be taken as perceived by the defendant, even if they were not the true facts or circumstances, *so long as a reasonable person in the defendant's position could also reasonably perceive the facts or circumstances in that way*.").

Hence, identifying the source of the stains as Appellant's blood would provide no potential support for Appellant's self-defense claim. Simply put, Appellant has failed to demonstrate that DNA testing would tend to show that he acted in self-defense. *See Satterfield*, 483 Md. at 470 ("There are several 'logical explanations' for why DNA testing

---

[17] The unrefuted testimony of Lt. Fletcher also shows that after he asked the Appellant if he called CO Cook a profane name, Appellant "got very belligerent[,] started throwing his arms around in the air saying he doesn't have to listen to this [expletive,] and started to walk back on to the tier where he came from."

*. . . would not* produce exculpatory or mitigating evidence." (quoting *Givens*, 459 Md. at 717)).

Appellant alternatively argues, like he did before the circuit court, that Lt. Fletcher was not seriously injured within the meaning of CR § 3-202. With respect to this argument, Appellant must show that there is a reasonable probability that DNA testing has the scientific potential to produce evidence tending to show that he neither caused, nor attempted to cause, *serious* bodily injury. *Satterfield*, 483 Md. at 467; *Givens*, 459 Md. at 707–08.

First-degree assault prohibits intentionally causing or attempting to cause serious physical injury. CR § 3-202(b)(1). A "serious physical injury" is one that "creates a substantial risk of death" or "causes permanent or protracted serious[] . . . impairment of the function of any bodily member or organ." CR § 3-201(d)(1), (d)(2)(iii).[18] The record below shows substantial evidence of the severity of Lt. Fletcher's injuries. The circuit court appropriately instructed the jury on the elements of first-degree assault, reflecting the State's theory that Appellant committed first-degree assault by both actually causing serious injury to Lt. Fletcher and intending to cause serious injury to Lt. Fletcher.

Proving whether the stain on Appellant's shirt was Lt. Fletcher's blood, Appellant's blood, or some substance other than blood does little in the way of proving or disproving the severity of Lt. Fletcher's injuries. Appellant's theory would have us assume that Lt.

---

[18] As with the statutory elements of first-degree assault itself, the definition of "serious physical injury" has remained virtually unchanged since the time of Appellant's 2004 conviction. *See* CR § 3-201(c) (2002).

23

Fletcher's injuries could be serious, as contemplated by CR § 3-202(b)(1), *only* if blood from Lt. Fletcher spattered onto Appellant's shirt. While such an occurrence surely would support the notion that Lt. Fletcher's injuries were serious, the inverse is not true. That is, if the stain on Appellant's shirt is not Lt. Fletcher's blood, then it *does not* tend to prove that Lt. Fletcher's injuries *were not serious*.

Neither would the results of DNA testing tend to show that Appellant did not *attempt* to cause serious physical injury. As discussed earlier, a perpetrator can commit first-degree assault, no matter the result of their actions, by attempting to cause serious physical injury. Here, the record irrefutably demonstrates that Appellant delivered a series of strikes to Lt. Fletcher's head. Whatever result DNA testing would show, it would have no bearing on the number of strikes to the target area and, therefore, Appellant's *attempt* to commit serious injury against Lt. Fletcher.

We hold, therefore, that the circuit court did not err in determining, as a matter of law, that there is not a reasonable probability that DNA testing has the scientific potential to produce exculpatory or mitigating evidence. *See Satterfield*, 483 Md. at 470 ("[T]here is enough other incriminating evidence and an explanation for the DNA result[] to establish Petitioner's guilt." (alterations in original) (internal quotation marks and citation omitted)). Because any hypothetical test results would (1) have no bearing on Appellant's claim of self-defense and (2) provide nothing more than conjecture as to the seriousness of Lt. Fletcher's injuries, testing would only serve to "maintain[] the status quo." *Givens*, 459 Md. at 716. For that reason, there is not a reasonable probability that the DNA testing requested by Appellant has the scientific potential of producing exculpatory or mitigating

24

evidence.[19]  Therefore, the circuit court correctly denied the Appellant's Petition for DNA testing without a hearing.

## 2. The circuit court's standard of review

Finally, Appellant contends that the circuit court applied the wrong standard of review in its Order denying the Petition.  Appellant argues that the circuit court erroneously used a more stringent standard to determine his entitlement to testing under the DNA Testing Statute.  Appellant takes issue with the Order's statement that "*the circuit court was not persuaded the DNA [t]esting would produce exculpatory or mitigating evidence of wrongful conviction or sentencing*."  Appellant also asserts that "*overwhelming and persuasive evidence*" of guilt is an improper basis for the circuit court to deny the Petition.  On the other hand, the State, while acknowledging that some introductory language in the Order appears to state the incorrect standard, urges us to construe the Order in its entirety and hold that the Order's direct use of the language from the DNA Testing Statute and Rules is demonstrative of the circuit court's use of the proper standard.

We have consistently stated that the DNA Testing Statute does not require a petitioner to establish that testing would produce a different outcome.  *Givens*, 459 Md. at 707–08; *Edwards*, 453 Md. at 187; *Gregg v. State*, 409 Md. 698, 720 (2009).  Instead, the Statute "only requires a showing that the desired testing has a reasonable probability . . . to

---

[19] Because Appellant does not demonstrate a reasonable probability that testing has the scientific potential to produce mitigating or exculpatory evidence, CP § 8-201(d)(1)(i) is not satisfied, and we do not address the manner of testing requested under § 8-201(d)(1)(ii).

produce relevant exculpatory or mitigating evidence[.] *Gregg*, 409 Md. at 720. It is upon this showing that a circuit court must order a hearing. Rule 4-709(a)(1).

While the introduction to the circuit court's Order was inaccurately worded, that does not doom its substance because the court later stated, and then applied, the correct standard. The circuit court clarified in the conclusion of the Order that it was "not persuaded . . . that DNA testing in [Appellant's] case has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing and, therefore, that the Petition . . . should be denied without a hearing." Effectively, the circuit court's Order references the testimony and evidence used at trial, noting that it was overwhelmingly in favor of the State's theory of the case, and based on the arguments in Appellant's Petition, as referenced against the evidence heard at trial, concludes that there was no probability that testing would produce the requisite evidence. The conclusion's language controls the disposition of the Petition and overcomes any controversy in the introductory language of the order.

Further, the Order's conclusion is nearly identical to the language in the DNA Testing Statute and the Maryland Rules. *See* CP § 8-201(a)(5)(iii) ("[A] reasonable probability exists that the DNA testing *has the scientific potential to produce exculpatory or mitigating evidence* relevant to a claim of wrongful conviction or sentencing[.]" (emphasis added)); Md. Rule 4-704(a)(2)(B)(iii) ("[A] reasonable probability exists that the requested DNA testing *has the scientific potential to produce exculpatory or mitigating evidence* relevant to a claim of wrongful conviction or sentencing[.]" (emphasis added)). Ultimately, the circuit court concluded that DNA testing had *no* scientific potential to

26

produce exculpatory or mitigating evidence, let alone the "reasonable probability" that Appellant needed to demonstrate. So, the circuit court made the requisite statutory findings and appropriately denied Appellant's Petition.

### D. *Appellant's Procedural Claims*

Appellant lodges two procedural challenges. First, he alleges that he should have been afforded the opportunity to respond to the State's answer to his Petition. From his point of view, the timing of the circuit court's order is an error because Rule 4-708 gives him the right to file a response to the State's answer. We resolved this issue in *Satterfield* where we held that the circuit court need not consider a petitioner's response, nor wait for the petitioner's window to file a response to close before ruling on a pending petition. 483 Md. at 481. Because there is not a reasonable probability that DNA testing has the scientific potential to produce exculpatory or mitigating evidence, the circuit court was within its discretion to deny Appellant's Petition after the State filed its answer but before the submission of a response. *See id.*; Md. Rule 4-709(b)(1)(B).

Second, Appellant alleges that he was not provided with a copy of the circuit court's October 19, 2023, Order in violation of Maryland Rule 4-709(e), thereby denying him the ability to brief or argue in this Court. This allegation of error has no merit. Even if Appellant did not receive the circuit court's order, his counsel later filed supplemental briefing on the merits. Thus, we discern no prejudice from the circuit court's alleged procedural noncompliance, which did not impact Appellant's ability to proceed with this appeal.

27

# V
# CONCLUSION

We hold that Appellant has failed to demonstrate that a reasonable probability exists that DNA testing has the scientific potential to produce exculpatory or mitigating evidence. In this case, even if testing could determine that the source of the substance on Appellant's shirt was not Lt. Fletcher's blood, it would not negate the seriousness of the injuries that Lt. Fletcher suffered nor positively affect the merits of Appellant's self-defense argument. In other words, DNA testing of the Appellant's shirt has no probability of producing exculpatory or mitigating evidence for his first-degree assault. Thus, the circuit court's Order satisfied the relevant statutory requirements in denying Appellant's Petition without a hearing.

**JUDGMENT OF THE CIRCUIT COURT FOR SOMERSET COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**